UNITED STATES of America, Plaintiff–Appellee,

v.

**Logan P. HUNTRESS, Defendant–Appellant.**

No. 91–5626.

United States Court of Appeals, Fifth Circuit.

March 18, 1992.

Rehearing Denied April 28, 1992.

---

Anthony Nicholas, Roy R. Barrera, Sr., Nicholas & Barrera, San Antonio, Tex., for defendant-appellant.

Mark R. Stelmach and LeRoy Morgan Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for U.S.

Before THORNBERRY, KING and DeMOSS, Circuit Judges.

KING, Circuit Judge:

This case principally requires us to clarify the procedures a district judge must follow when a juror is dismissed during deliberations. We also review several other alleged errors that took place at trial. We will affirm the appellant's conviction.

## I. BACKGROUND

Logan P. Huntress was tried by a jury on five counts of knowingly making false statements to federally insured banking institutions for the purpose of influencing them to extend credit to him, in violation of 18 U.S.C. § 1014. He was convicted and sentenced to two consecutive two-year sentences, five years of probation, restitution of $730,000, and a $50 special assessment on each count. The evidence at trial showed that Huntress submitted false financial statements when he applied for loans from several San Antonio banks. Huntress stated in the financial statements and in discussions with bank officers that he owned a substantial unencumbered stock portfolio, although he did not own the stocks listed on the financial statements. Officers from the various banks involved testified that they relied upon Huntress's false written and oral statements regarding his financial position in deciding to extend credit.

As the primary contentions on appeal concern events that occurred after the trial, we relate those events here in some detail. We will discuss the facts bearing upon Huntress's other arguments in the course of our legal analysis of those arguments.

After the close of the evidence, the jury retired to deliberate and the judge dismissed the alternate juror. The jury deliberated for the rest of that day. On the morning of the next day, the court received a note from the jury foreman stating that one of the jurors wanted a conference with the judge. In response to questioning, the foreman told the judge that the juror had a problem with the facts or the law of the case. The judge told the jury foreman to submit the juror's question in writing. An hour later, the jury sent a note that said, "A juror doesn't want to participate in arriving at a verdict. What do we do?" The judge sent a note back stating, "All jurors will continue to deliberate until you have reached a verdict." The jury did not reach a verdict that day, and, because they were not sequestered, they went home.

The next morning, Dr. Nau, a doctor who was treating juror Homoki, contacted the court. Mr. Homoki had checked himself into a hospital the previous night, threatening to ingest fire ant killer if the hospital refused to admit him. After some discussion with the parties, the judge called Dr. Nau to find out the details surrounding the juror's condition. Dr. Nau told the judge over the telephone that the juror was distraught and suicidal, and that he was suffering from paranoia stemming from a history of drug abuse. Dr. Nau opined that Mr. Homoki's condition was brought on by the stress related to his jury service, and

that Mr. Homoki could not make a decision in the case in his present condition. He recommended that Mr. Homoki not be required to return to jury duty upon his imminently scheduled release from the hospital. Defense counsel requested an evidentiary hearing to examine Mr. Homoki as well as the doctor, but the judge determined that his conversation provided a sufficient basis for excusing Mr. Homoki from jury service. No evidentiary hearing was held.

The district judge presented the parties with three options: allow the remaining 11 jurors to proceed to a verdict; recall the alternate juror, Ms. Lizana; or declare a mistrial. Huntress objected to the release of Mr. Homoki, refused to stipulate to an 11–juror verdict, and objected to recall of the alternate juror. The government expressed a preference for an 11–juror verdict, and pointed out that, under Fed. R.Crim.P. 23(b), the court could permit the 11–member jury to proceed to verdict without obtaining the defendant's consent. Huntress then moved for a mistrial based on Mr. Homoki's failure truthfully to answer voir dire questions concerning his ability to serve on the jury. The judge had asked during voir dire, "Is there anyone on the jury panel that has any serious personal situation or medical or physical problem which would make it difficult or impossible for you to sit as a juror in this case?" Mr. Homoki had not responded to that question. The judge, citing Dr. Nau's statement that Mr. Homoki would have been unable to recognize and disclose his psychological condition during voir dire, decided that Mr. Homoki did not deliberately lie, and denied Huntress's motion for a mistrial.

Huntress then requested that Ms. Lizana, the alternate juror, be recalled and examined to determine whether she could properly be reimpaneled. The judge recalled Ms. Lizana and questioned her. Ms. Lizana stated that she had discussed the case with her boss, but only in general terms, and she stated that this discussion would not influence her decision in the case. The judge questioned the other 11 jurors regarding their ability to set aside all previous discussions and begin their deliberations afresh with the newly reconstituted jury. They all claimed that they could do so. Based on these interviews, the judge decided to reimpanel Ms. Lizana as a member of the jury, and the new jury retired to deliberate. After three hours, the jury returned a verdict of guilty on all counts.

## II. DISCUSSION

### A. *Release of Juror Homoki*

Huntress first argues that the district judge erred in dismissing Mr. Homoki. "[I]t is within the trial judge's sound discretion to remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired." *United States v. Dominguez*, 615 F.2d 1093, 1095 (5th Cir.1980) (citations omitted); *see also United States v. Helms*, 897 F.2d 1293, 1298 (5th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 257, 112 L.Ed.2d 215 (1990). We will not disturb the judge's decision unless we find that it prejudiced the defendant or another party. *United States v. Rodriguez*, 573 F.2d 330, 332 (5th Cir.1978). Prejudice occurs in these circumstances when a juror is discharged without factual support or for a legally irrelevant reason. *Id.* Huntress attempts to squeeze through this narrow standard of review by contending that there is a basis in the record for believing that Mr. Homoki was a holdout juror who feigned mental illness to avoid the coercive pressure of his fellow jurors. In support of this theory, Huntress points to the facts that (1) the foreman indicated to the judge after the first note that a juror had a problem with the facts or the law, not a physical or family matter; (2) the jury's second note indicated that one of the jurors did not want to participate in a decision; and (3) Mr. Homoki had not exhibited any sign of incapacity during the voir dire or the week-long trial. Citing *United States v. Wilson*, 894 F.2d 1245 (11th Cir.), *cert. denied sub nom. Levine v. United States,* — U.S. —, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990), he contends that evidence of a holdout juror is an important factor in de-

termining whether the district judge abused his discretion.

We find that the district judge had an adequate factual and legal basis for dismissing Mr. Homoki. *Wilson* in no way stands for the proposition that any evidence that the juror was a holdout raises a red flag. In that case, the judge dismissed a juror who had been in poor health throughout the trial after the juror became even more ill during deliberations. In upholding the judge's decision, the court merely "note[d] that the record does not present even the slightest basis to believe that this juror was a holdout juror or that the jury had reached any sort of impasse in its deliberations." *Id.* at 1250.

More importantly, the evidence to which Huntress points to support his theory that Mr. Homoki was a holdout juror is not inconsistent with Dr. Nau's diagnosis of mental incapacity. Assuming that the juror who had a problem participating in a decision was Mr. Homoki, Dr. Nau's statements to the judge support the conclusion that the problem stemmed not from Mr. Homoki's status as a holdout juror, but from a severe, pre-existing condition related to a history of drug abuse. The facts that Mr. Homoki had previously served as a juror on a jury that reached a decision, that he did not respond in the negative to the question whether any mental or physical problem would prevent him from serving, and that he was able to sit through the trial without incident, do not detract from the judge's decision. The question was whether Mr. Homoki had *become* so impaired at a particular point in the course of his jury service that he could no longer perform the function required of him at that time. A juror's physical or mental capacity for service can change throughout the trial. Earlier, Mr. Homoki's task was simply to sit through the trial and listen to the evidence, while after the close of the evidence his task was to deliberate and reach a decision. Huntress's theory of Mr. Homoki as a holdout juror who may have feigned illness and checked himself into the hospital to avoid the pressure of his fellow jurors is pure speculation with no support in the record. Apparently without appreciating its significance, he states that "[t]he first evidence of any physical inability to perform is Dr. Nau's phone call to the Court." This phone call, however, was critical in that it revealed to the judge that Mr. Homoki's mental state prevented him from deliberating. Huntress seeks to detract from Dr. Nau's recommendation by pointing out that he had not previously treated Mr. Homoki, but the record suggests that Dr. Nau was familiar enough with the details of Mr. Homoki's condition to evaluate his ability to continue to serve on the jury.

█ We decided a case very much like the present one nearly two years ago. In *United States v. O'Brien,* 898 F.2d 983 (5th Cir.1990), the wife of one of the jurors telephoned the judge after deliberations began and informed him that the juror was suffering from severe depression. The judge spoke with the juror's treating psychiatrist, who advised the judge that the juror was susceptible to bouts of depression. Although the psychiatrist had not yet decided whether to hospitalize the juror, he told the judge that the juror was in no condition to continue deliberations. We considered this information sufficient to enable the judge to release the juror. *Id.* at 986. Although the defendant in *O'Brien* did not advance a theory of the dismissed juror as a holdout, we have pointed out that the evidence in support of such a theory is also consistent with severe mental illness. Based on the judge's conversations with Mr. Homoki's doctor, we conclude, as we did in *O'Brien,* that the district judge did not abuse his discretion in deciding to release a juror who became impaired as a result of mental illness during deliberations.[1]

---

1. Given the evidence of Mr. Homoki's disability provided by Mr. Homoki's doctor, the district judge was not required, as Huntress argues, to hold an evidentiary hearing in which both parties could explore the existence of just cause for dismissal. Although the judge stated that he was not certain whether a hearing had been held prior to dismissal in *United States v. Helms,* 897 F.2d 1293 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 257, 112 L.Ed.2d 215 (1990), he clearly had enough information from the phone call to make a decision, and there was no evi-

## B. *Recall of Alternate Juror*

Claiming denial of his right to a fair and unbiased jury, Huntress next challenges the judge's decision to substitute Ms. Lizana, the alternate juror. He argues for reversal on two grounds: the judge failed to follow the 1983 amendment to Rule 23(b), which requires an 11–juror verdict in the event a member of the original 12–member jury is unable to deliberate; and he was prejudiced by the inclusion of Ms. Lizana in deliberations.

### 1. *Rule 23(b) Procedure*

■ Prior to 1983, the Federal Rules of Criminal Procedure did not address the procedures district judges should follow when a juror was released after deliberations began. Rule 23(b) required a unanimous verdict of 12 jurors, unless the defendant agreed to accept a verdict issued by less than 12.[2] We, therefore, held that an 11–person jury could proceed to verdict, but only if the parties so stipulated and the court approved. *United States v. Taylor*, 507 F.2d 166, 168 (5th Cir.1975). Rule 24(c) required, as it still does, that alternate jurors be discharged once the jury retires to deliberate. Thus, unless the parties agreed to proceed to verdict with 11 jurors, the only other option was a mistrial.

In *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981), *cert. denied sub nom., Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), this court permitted substitution of an alternate juror ("post-submission substitution") after a lengthy, complex trial where the trial judge took steps to ensure that the verdict would not be tainted by the addition of an alternate juror after deliberations began. The defendants refused to stipulate to a verdict by a jury of less than 12, and the costs of retrying a case that had been in trial over four months would have been significant. We pointed out that a defendant could complain about reimpaneling of an alternate juror only if it worked to his prejudice, *id.* at 993,[3] and, finding both that procedural safeguards had been taken to eliminate prejudice[4] and that the record revealed little likelihood of prejudice,[5] we affirmed the verdict. Dissatisfied with this solution to the problem, the Advisory Committee on Rules shortly thereafter proposed an amendment to Rule 23(b) which would permit an 11–juror verdict even absent the parties' stipulation. The Supreme

---

dence suggesting any other reason for Mr. Homoki's inability to continue to serve. Under these circumstances, a hearing would not have served any useful purpose.

Our resolution of this issue also disposes of Huntress's contention that he was denied the right to a fair trial and to effective assistance of counsel as a result of Mr. Homoki's answers during voir dire. Huntress contends that, had he known of Mr. Homoki's true condition, he could have exercised his peremptory challenges in a more informed manner. The information provided by Mr. Homoki's doctor to the court, however, indicates that Mr. Homoki's paranoia prevented him from honestly answering the questions on voir dire. Given Mr. Homoki's condition, it does not appear that he intentionally misled the court; he likely had no greater ability to predict his impairment than did the jurors in *O'Brien* and *Helms*.

2. There is no constitutional bar to a jury verdict of less than 12. *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

3. We had earlier held that a violation of Rule 24(c) would not require reversal unless there was a reasonable possibility that the violation had an effect on the verdict. *United States v. Allison*, 481 F.2d 468, 472 (5th Cir.1973), *cert. denied*, 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 759 (1974). In *Allison*, the rule was violated when the trial judge permitted the alternate to sit in on the jury's deliberations.

4. The judge received assurances from the alternate that he had neither been exposed to publicity about the trial nor discussed it, confiscated materials the other jurors had used during deliberations, received assurances from the other jurors individually that they could put aside their earlier deliberations, and instructed the jurors to begin anew with the alternate juror. *Phillips*, 664 F.2d at 990–91.

5. We noted that the jury deliberated for one week after the alternate was substituted. *Phillips*, 664 F.2d at 996. This was important evidence that deliberations with the alternate were full and fair. We contrasted this with *United States v. Lamb*, 529 F.2d 1153 (9th Cir.1975) (en banc), in which one factor leading the court to reject post-submission substitution was the fact that the reconstituted jury deliberated only 29 minutes. *Phillips*, 664 F.2d at 995–96.

Court adopted this amendment in 1983, so that Rule 23(b) now reads:

> **Jury of Less Than Twelve.** Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

In its Notes to the 1983 amendment, the Advisory Committee on Rules expressed a strong preference for an 11–juror verdict over the alternatives of substitution and mistrial. While recognizing that the extraordinary length of the trial made substitution preferable to mistrial in *Phillips*, the Committee indicated that "it is far better to permit the deliberations to continue with a jury of 11 than to make a substitution...." [6] The Committee suggested that trial courts exercise their discretion to allow 11–juror verdicts absent stipulation primarily after protracted trials.

One of our decisions issued after the 1983 amendment to Rule 23(b) affirmed a jury verdict in a case where the district judge substituted an alternate after the jury had retired to deliberate. In *United States v. Helms*, 897 F.2d 1293 (5th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 257, 112 L.Ed.2d 215 (1990), a pregnant juror went into labor before the third day of deliberations and the judge excused her. After failing to obtain agreement from the parties on a course of action, the judge sought and received assurances from the alternate and the remaining jurors that they could decide the case fairly. He then decided to substitute the alternate. *Id.* at 1298–99. We held that there was no reversible error because "[t]he record demonstrate[d] that the trial judge was extremely careful with respect to questioning the jurors and instructing them as to how they should proceed [and] was also meticulous in following the procedure set forth" in *Phillips*. *Helms*, 897 F.2d at 1299.

We did not mention in *Helms* the fact that Rule 23(b) directed the district judge to allow an 11–juror verdict rather than substitute the alternate juror. A review of the briefs in that case suggests that this resulted from the defendants' desire not to proceed with 11 jurors. All but one defendant (Vandervort) expressed a preference for the procedure in *Phillips*, while Vandervort requested that the jury issue a sealed verdict on any decision made up to that point and then continue on with the alternate. The defendants in that case did not argue, as does Huntress, that the failure to follow Rule 23(b) amounted to reversible error. Instead, their focus was on the prejudice that inured as a result of what they considered to be the judge's improper use of the *Phillips* procedure. We may therefore have viewed the defendants' conduct as amounting to a waiver of any complaint about the judge's disregard for Rule 23(b). As we point out in section II.B.2 below, Huntress's conduct also may be viewed as effecting a waiver of his right to challenge the use of the *Phillips* procedure rather than an 11–juror verdict, so the failure to follow Rule 23(b) here, as in *Helms*, is not fatal to the verdict. But we wish to emphasize that the amendment to Rule 23(b) removes from district judges any choice between proceeding with 11 jurors and using the *Phillips* procedures.

■■■ The district judge in this case apparently read *Helms* as giving him those two options. In express reliance on that decision, he asked the parties whether they preferred to continue with 11 jurors or to substitute the alternate juror using the *Phillips* procedures. We read Rule 23(b), in conjunction with the prohibition on recalling alternate jurors in Rule 24(c), as requiring that district judges allow an 11–member jury to proceed to verdict or grant

---

**6.** The Committee considered and rejected an amendment to Rule 24 which would have allowed post-submission substitution of an alternate juror if defendants were afforded the protections of *Phillips*. *See* 91 F.R.D. 289, 341–45 (1981).

a mistrial. *Phillips* was a judicially-crafted solution to Rule 23(b)'s then-existing prohibition on 11-juror verdicts absent stipulation of the parties. We accepted the end run around Rule 24(c) both because there was no prejudice to the defendant from recalling the alternate and because the costs of a mistrial in that case would have been extremely high. The intent of the 1983 amendment to Rule 23(b), however, was to obviate the need for the *Phillips* procedure. Accordingly, we must conclude here that Rule 23(b) was violated when the district judge decided to substitute the alternate juror rather than proceed to verdict with an 11–member jury.

### 2. *Effect of the Rule 23(b) Violation*

■ Although there was a violation of Rule 23(b), we agree with the government that Huntress waived his right to complain about it when he agreed to the substitution of the alternate juror.[7] The Eleventh Circuit confronted a similar situation in *United States v. Guevara*, 823 F.2d 446 (11th Cir.1987). There, the defendant's counsel objected to the district judge's proposal to follow Rule 23(b) and demanded that the alternate juror be impaneled. The judge complied, and the defendant argued on appeal that the failure to follow Rule 23(b) required reversal. The court quite sensibly refused to allow the defendant to take advantage of his expressed desire to forego the Rule 23(b) procedure, holding that "[w]here the defendant knowingly consents to the addition of an alternate juror, as was

obviously the case here, he waives any challenge to that procedure on appeal." *Id.* at 448.[8] Huntress argues that he did not waive his objection to the judge's recall of the alternate juror because he consistently expressed his desire to be tried by the original jury of 12, but this argument makes little sense once we accept the judge's decision to dismiss Mr. Homoki. He also contends that he agreed to the recall only after the judge denied his motion for a mistrial, but the record reveals that he opposed an 11–juror verdict. Although Huntress did not demand the recall of the alternate juror, as did the defendant in *Guevara*, his desires (1) not to proceed with 11 jurors and (2) to have his fate decided by a jury of 12 provide decisive evidence that he waived his objection at the time of the trial. His after-the-fact protestations to the contrary in his reply brief are unavailing.

■ Having found that the violation of Rule 23(b) is not fatal to the verdict, we must determine whether Huntress suffered any prejudice from the district judge's recall of the alternate juror. This requires an inquiry into whether the judge afforded Huntress the protections we found critical in *Phillips*. As in *Phillips*, we need not reverse unless the substitution somehow worked to Huntress's prejudice. 664 F.2d at 994; *see also Helms*, 897 F.2d at 1299. Huntress argues that he was prejudiced because the alternate juror, Ms. Lizana, admitted discussing the case with her boss, and because the reconstituted jury deliber-

---

7. We might be inclined to disregard the waiver if the Rule 23(b) violation was so prejudicial that we could not countenance a verdict under any circumstances. *See United States v. Josefik*, 753 F.2d 585, 588 (7th Cir.), *cert. denied,* 471 U.S. 1055, 105 S.Ct. 2117, 85 L.Ed.2d 481 (1985). However, the Rule 23(b) violation, strictly speaking, was only in the district judge's failure to choose between the alternatives of an 11–juror verdict and a mistrial. The actual substitution of the alternate juror is a separate violation of Rule 24(c), which requires the judge to discharge alternates when the jury retires to deliberate. We have repeatedly held that violations of Rule 24(c) are not *per se* prejudicial, *e.g., Allison,* 481 F.2d at 472, and there is no reason why violations of Rule 23(b) would be any more inherently prejudicial. Thus, we do

not see any reason not to accept Huntress's waiver of the Rule 23(b) violation.

8. While we agree with *Guevara* that a defendant can waive an objection to the district judge's recall of an alternate juror, we disagree with the Eleventh Circuit's implication that post-submission substitution is an alternative to Rule 23(b) that can be employed whenever a defendant expresses a desire to substitute or to have his fate decided by a jury of 12. As noted above, our acceptance of the *Phillips* procedure in *Helms* may have stemmed from the defendant's expressed desire to substitute. But without any analysis in *Helms* of whether Rule 23(b) leaves open the option to substitute alternate jurors, we must conclude that the case does *not* stand for the proposition that judges may simply choose between Rule 23(b) and *Phillips*.

ated only three hours before reaching a verdict of guilty. We disagree. Ms. Lizana had not been sequestered during deliberations, as was the alternate in *Phillips,* and thus may not have been as "pure" as the alternate in that case, but she indicated that the discussion she had with her boss after she was initially released related only to the general type of case involved and not to the substance of the evidence. In response to questioning from the judge, she said that she had remained insulated from media coverage of the case and that her discussion would not influence her in any way. As for the fact that the jury deliberated only three hours, this is consistent with the inability of Mr. Homoki to participate or reach a decision. The nature of Mr. Homoki's disability suggests that the jury made little or no progress during the time he was part of the deliberations, and three hours is not an inordinately short amount of time for deliberation in a case in which the evidence was overwhelming and the defendant's method of operation was the same in each of the five counts. Finally, the judge received assurances from each juror individually about his or her ability to disregard deliberations that took place with Mr. Homoki present, and instructed the jury to begin anew with Ms. Lizana. These procedures were substantially the same as were followed in *Phillips* and *Helms,* and afforded Huntress adequate protection from a tainted verdict.

### 3. *Procedures for the Future*

██ For the future, we wish to emphasize that district judges in this circuit should follow Rule 23(b) rather than substitute alternate jurors when a juror is excused after deliberations begin. The Second Circuit has expressed doubt about whether post-submission substitution is still permissible after the amendment to Rule 23(b), *United States v. Stratton,* 779 F.2d 820, 831–32 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986), and the Third Circuit has expressly held that trial judges should allow 11–juror verdicts under Rule 23(b) rather

than substitute alternate jurors. *United States v. Gambino,* 788 F.2d 938, 948–49 (3d Cir.), *cert. denied,* 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986).[9] We think it goes without saying that district judges are obligated to follow the Federal Rules of Criminal Procedure rather than a judicially-crafted solution to a problem which was not addressed by the Rules at the time of the decision. Although Rule 23(b) does not explicitly bar use of the substitution option, the text of the amended rule, together with Rule 24(c)'s direction to discharge alternate jurors before the jury retires, signals to us that substitution is quite inconsistent with the intent of the drafters of the Rules. The virtues of the 11–juror verdict allowed by Rule 23(b) are that it eliminates the risk of prejudice that arises whenever an alternate juror is recalled and does not require the agreement of the parties. District judges in this circuit therefore should no longer resort to the procedures used in *Phillips* and *Helms.*

### C. *Sufficiency of the Evidence on Count Three*

██ Huntress next argues that there was no evidence to support a conviction on count three of the indictment. Count three alleged that Huntress violated 18 U.S.C. § 1014 by knowingly making a false representation to a federally insured bank for the purpose of influencing an extension of credit in connection with a $35,000 loan made by MBank Alamo, N.A. The elements of a § 1014 violation are:

(1) the defendant made a false statement to an insured financial institution;

(2) the defendant made the false statement knowingly;

(3) the statement was made for the purpose of influencing the financial institution's action; and

(4) the statement was false as to a material fact.

*United States v. Thompson,* 811 F.2d 841, 844 (5th Cir.1987). The "essence" of a § 1014 offense is the making of a false

---

**9.** In *Gambino,* the court rejected the defendants' argument that the district judge should have disregarded Rule 23(b) and substituted an alternate.

statement with the intent to influence the lender; it does not depend on whether the defendant accomplished that purpose. *United States v. Shaid,* 730 F.2d 225, 232 (5th Cir.), *cert. denied,* 469 U.S. 844, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). We review all challenges to the sufficiency of the evidence under a common standard: we must determine whether a rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Gardea Carrasco,* 830 F.2d 41, 43 (5th Cir.1987); *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). We consider all the evidence, direct and circumstantial, in a light most favorable to the government, and we "accept all reasonable inferences which tend to support the jury's verdict." *Gardea Carrasco,* 830 F.2d at 43–44. Factfinders have considerable leeway in drawing inferences from the evidence presented to them. They may "use their common sense" and "evaluate the facts in light of their knowledge of the natural tendencies and inclinations of human beings." *United States v. Ayala,* 887 F.2d 62, 67 (5th Cir.1989) (citations omitted).

Applying this standard of review to the evidence concerning Huntress's making of a false statement with intent to influence the lender, we conclude that there is sufficient evidence to support the verdict. Count three involved a request made by Huntress over the telephone in June 1987 for a loan for the purpose of purchasing stock options. This was the second of three applications to MBank Alamo for unsecured loans above a limit that had been set earlier.[10] Reagan Houston, then Senior Vice President of MBank Alamo, testified that he had relied on Huntress's September 1986 financial statement in making the first of the three loans. He testified that when he received the request for the $35,000 loan in June 1987, he consulted Huntress's new financial statement dated April 10, 1987 and, while speaking over the telephone to Huntress, referred to the portion of the April 1987 statement in which

Huntress claimed to have large holdings of common stock. Houston asked Huntress whether he still owned the stock and whether it was still unpledged to other debts, and Huntress answered both questions in the affirmative. On the basis of these affirmations, the bank approved the loan. The evidence showed that Huntress's representations about unencumbered stock ownership were false. Houston's testimony clearly showed that Huntress used these representations to obtain the $35,000 loan from MBank Alamo. From this evidence, the jury could easily have concluded that Huntress knowingly made a false statement to the bank with the intent to influence it in connection with the June 1987 loan.

### D. Jury Instruction on Intent

■■■■■ Huntress contends that the trial judge erred in refusing to give his requested jury instruction on the element of intent under § 1014. Huntress wanted to instruct the jury that they must find that he "knowingly did an act which the law forbids, purposely intending to violate the law." He also contends that the judge erred in refusing to instruct the jury that the term "influence" means "to affect or alter the conduct, thought or character of by indirect or tangible means: sway." He argues that "influence" under § 1014 modifies the concept of intent, so that a specific definition of influence is necessary to enable the jury to understand the intent requirement for this crime. We review the refusal to give the requested instructions under an abuse of discretion standard. *United States v. Rochester,* 898 F.2d 971, 978 (5th Cir.1990). We may not disturb a conviction on the ground that a requested jury instruction was not given unless the instruction was legally correct, represented a viable defense theory which would lead to acquittal, and was not effectively presented elsewhere in the charge. *United States v. Mollier,* 853 F.2d 1169, 1174 (5th Cir.1988); *United States v. Rubio,* 834 F.2d 442, 447 (5th Cir.1987).

The district judge gave the Fifth Circuit pattern jury instructions for violations of

---

**10.** The first of these applications, in April 1987, formed the basis for count two.

18 U.S.C. § 1014, charging the jury that the government had to prove:

First: That the bank listed in the particular count was federally insured; Second: That the defendant made a false statement to that bank knowing it was false; and Third: That the defendant did so for the purpose of influencing that bank to give the defendant a loan or loan extension.

This charge required the government to prove the elements of § 1014. Huntress has cited no authority that would cast doubt on these Pattern Jury Instructions or that holds that the defendant must know his conduct is unlawful. Certainly, the government must prove that the defendant knew that the statements he was making to the financial institution were false; but this is quite different than requiring the government to prove that the defendant knew that making false statements to a financial institution is a violation of the law. Huntress's requested instruction on specific intent implies the latter and is simply a misstatement of the law. Under *Mollier*, refusal to give this instruction cannot be reversible error. Moreover, the judge refused to give the requested definition of the word "influence" because, he stated, that word is used in its everyday meaning in the statute. We agree with the judge that no elaboration was needed.

### III. CONCLUSION

Although the district judge did not abuse his discretion in deciding to discharge Mr. Homoki from the jury, he had the discretion to permit the 11-person jury to deliberate and reach a verdict regardless of the defendant's refusal to consent. We emphasize again that district judges should follow Rule 23(b)—that is, they should decide whether to proceed with an 11-person jury or retry the defendant—rather than substitute an alternate juror under the procedure approved of in *United States v. Phillips*. Although the judge here did substitute, we conclude that the defendant waived any objection to the violation of Rule 23(b) by refusing to agree to an 11-juror verdict and by agreeing to the substitution of the alternate juror. We further conclude that

the defendant was not prejudiced by the reimpaneling of juror Lizana. Finally, we conclude that the evidence was sufficient to support the conviction on count three and that the district judge did not err in refusing the defendant's requested jury instructions. The conviction is AFFIRMED.