Eileen C. GARCIA, Petitioner,

v.

The PEOPLE of the State of Colorado, Respondent.

No. 98SC794.

Supreme Court of Colorado, En Banc.

March 13, 2000.

David Kaplan, Colorado State Public Defender, Douglas D. Barnes, Deputy State Public Defender, Denver, Colorado Attorneys for Petitioner.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, Lauren A. Edelstein, Assistant Attorney General, Criminal Enforcement Section, Denver, Colorado Attorneys for Respondent.

Justice SCOTT delivered the Opinion of the Court.

Today, we must decide whether a trial judge may dismiss a juror after the jury has commenced deliberations and without a record to support findings that the juror is biased or prejudiced. Because of the core importance of jury deliberations and because our review of the record does not disclose any inquiry by the trial judge into the foreperson's allegations that the juror was unwilling to follow the instructions given to all jurors, we conclude that the juror was im-

properly dismissed. Accordingly, we reverse the judgment of the court of appeals in *People v. Garcia*, 964 P.2d 619 (Colo.App.1998).[1]

■ Our analysis in this case is informed both by the core importance of jury deliberations and the crucial role juries play in the administration of justice. We hold today that if a trial court interrupts the deliberations of a jury and suspends its fact finding functions to investigate allegations of juror misconduct, its inquiry must not intrude into the deliberative process. We further hold that, in the exercise of judicial discretion, before a juror is dismissed from a deliberating jury due to an allegation of juror misconduct, there must be findings by the trial court that support a conclusion that the allegedly offending juror will not follow the court's instructions.

## I. FACTS

### A. Underlying Facts

In September of 1994, Eileen C. Garcia (defendant) and her live-in boyfriend, Jonathan Montoya, began babysitting Montoya's nineteen-month-old niece, Grace, as well as Montoya's toddler nephews. From that time through the beginning of 1995, the children's mother, Karen Montoya, noticed that Grace had returned from defendant's home with bruises on her head and body. Defendant explained these bruises as the result of accidental falls.

On the morning of February 28, 1995, Jonathan Montoya telephoned Karen Montoya to tell her that Grace had fallen off of a slide and that defendant was bringing Grace to the hospital where Karen Montoya worked as a medical assistant. When they arrived, Grace was limp and non-responsive.

Karen Montoya brought her into the emergency room, where the medical staff diagnosed Grace with a subdural hematoma, a collection of blood between the brain and skull that creates potentially fatal pressure against the brain. Surgery to relieve the pressure on Grace's brain was unsuccessful and she never regained consciousness. She died that evening.

Defendant was charged in the District Court of El Paso County with one count of child abuse resulting in death. *See* § 18–6–401(7)(a)(I), 6 C.R.S. (1999). The main defense theory at trial was that Grace's injuries were accidental.[2]

First, evidence was presented that Grace's death resulted from the cumulative effect of three accidental falls occurring within four days of her death. Grace's mother, Karen Montoya, testified that on February 24, 1995, defendant called to inform her that Grace had fallen in the bathtub. Grace arrived home that evening with a bruise above her right eye. Grace's mother also testified that two days later, on February 26, Grace fell from her bunkbed at home. Further evidence introduced at the trial suggested that Grace had again fallen in the bathroom on the same morning of the events in question, this time striking her head on the toilet tank.

Supporting the defendant's claim that these incidents caused Grace's injury, the emergency room pediatrician who examined Grace on the day of her death testified that a bruise above her right eye was the only bruise on her head severe enough to be the likely cause of the injury to Grace's brain.[3] The other emergency room physicians, with the exception of the partner of Grace's regular pediatrician, noted only that bruise as well.[4]

---

1. The issue on which we granted certiorari reads as follows:

   Whether the trial court erred in disqualifying, after deliberations had commenced, a juror who had not been shown to be biased or prejudiced, in failing to take any steps whatsoever to insure that the removal of the juror was not a ruse by the majority to eliminate dissention, and in denying defendant's subsequent motion for mistrial.

2. In the alternative, defendant presented psychiatric evidence to demonstrate impaired mental

condition. Defense experts testified that defendant had suffered from dissociative episodes since she was a teenager.

3. That doctor also testified, however, that the bruise on her forehead appeared to be from an injury suffered less than twelve hours earlier.

4. The coroner discovered other bruises, both on Grace's skin and the surface of Grace's brain, and concluded from this evidence that Grace had suffered at least seven or eight distinct blows to her head.

Second, defendant presented evidence that Grace's injuries resulted from a three-and-one-half-foot fall from a playground slide onto icy gravel·on the day of her death. This was her explanation to police on the day of Grace's injury. Supporting defendant's claim that she did not cause Grace's injuries was the previously videotaped testimony of Grace's brother Michael. Michael, who was five years old at the time, testified that he saw Grace fall from a playground slide.[5]

The State called as witnesses several medical doctors who testified on direct examination that Grace's injuries were inconsistent with either of defendant's explanations. Instead, the doctors testified that Grace's injuries had been inflicted deliberately, as the result of forceful blows to the head and, possibly, violent shaking. Each doctor testified that he or she based the proffered conclusion on several factors. Those factors included the force necessary to cause a fatal subdural hematoma like Grace's and the fresh bruising on her right forehead, cheek, and eye, as well as fresh abrasions on her nose, lips, and mouth. In addition, the doctors considered the· massive amount of blood collected at the back of Grace's eyes, a condition also known as "retinal hemorrhaging," and a swollen optic nerve.

On cross-examination, however, all of the medical experts conceded that a three-and-one-half-foot fall could result in a subdural hematoma. In fact, the same coroner who autopsied Grace had in the months before defendant's trial ruled an accidental fall from about that height onto a tile kitchen floor the cause of a fourteen-month-old child's subdural hematoma. Furthermore, the State's medical experts admitted that the injuries that caused Grace's death could also have been caused by a severe blow to the head, such as children suffer in car accidents or in falls from high places onto hard surfaces. They also conceded that a swollen optic nerve can be caused by a subdural hematoma itself, since a hematoma raises the pressure surrounding the optic nerve.

Finally, another doctor, the partner of Grace's regular pediatrician, testified that Grace had never exhibited signs of abuse. He testified that the only injury that Grace appeared ever to have suffered was the one that resulted in her death that day.

On these facts, Garcia was charged and tried before a jury for crimes that allegedly led to the injuries suffered by Grace. After a three day trial, the trial court instructed the jury and submitted the case to the jury for its deliberations.

## B. Facts Relating to Removal of the Juror

Approximately one hour after the jury began to deliberate, the foreperson sent a note to the trial judge complaining about one of the jurors:

Judge—

We have one juror who refuses to accept the Medical Expert testimony as evidence. He is *imfatically* [sic] stating that he feels there is no evidence & that he will never change his mind.

He states that he will not follow the Judge's instruction.

We aren't sure what to do—is there any way you can help us[?]

After consulting with both attorneys, the trial judge responded by sending a note to the jury. He advised the jury to review all of the jury instructions, particularly those having to do with "burden of proof (reasonable doubt), witness credibility and expert witnesses." Presumably, the jurors then reviewed the instructions and returned to their deliberations; the record does not indicate otherwise. In any event, the record does not reflect any communication to the trial judge that the jury had any difficulty following his suggestion or that they were unable to review the evidence or proceed with their deliberations.

About one ·hour later, the jury, still engaged in its deliberations, requested one of the dolls used for demonstrative purposes during the trial. The record does not indicate why the jury requested the doll; howev-

---

5. Defendant explained to police on the night of the incident that Grace herself had climbed to the top of a slide before falling down the ladder.

Michael testified, though, that defendant placed Grace on the slide and that Grace was "sleeping" at the time.

er, there is no indication at that time that deliberations had been suspended.

Then, the jury asked to have a yardstick or something measuring three feet long.[6] As it had earlier, the court denied that request.

About one hour after those two evidentiary requests, the foreperson requested a copy of the jurors' oath. Over defense objection, the court provided the jury with a copy of the oath. The oath given to the jury reads as follows:

Do you and each of you swear or affirm that you will try the case now before the Court and arrive at a verdict according to the evidence and the law as contained in the instructions of the Court?

Shortly thereafter, the jury adjourned for the day, without any indication that any juror was not participating fully in deliberations or had refused to follow the court's instructions.

The next morning, about twenty-five minutes after the jury resumed its deliberations, the foreperson sent the court her fourth note. The foreperson stated in her note to the court that she believed that the same juror referred to in her first note was not complying with the jurors' oath. Specifically, she wrote:

We are not able to come to a decision. We have one juror whom we feel has not complied with what we as jurors took an oath to do. Here are the reasons we feel this way:

1) This person told several jurors that he felt this would be a hung jury. This began 2 or 3 days into the trial.

2) He feels that the doctors, district attorneys, and police detectives conspired against the defendant, here are some quotes "Doctors are Demi–Gods" "The doctors were paid by the District Attorney's office."

3) This person told us as soon as we walked into the jury room to begin deliberation "I don't care what you all say—my mind is made up, she is not guilty until Hell Freezes over." This statement was made before we even started to deliberate.

Is there any way in this situation to avoid having a hung jury? The other jurors are not ready to give up-WE DON'T WANT A HUNG JURY. Please help us.

In response, the trial court interviewed the foreperson in camera. The court asked her if a juror was "refusing to follow their oath and the instructions of the Court," to which she replied, "Yes." She added, "[T]here's no discussion. The person is really even unwilling to even participate in any type of discussion. We can't deliberate. We haven't been able to from the time we started." She also reported that during the trial the same juror had said to other jurors, "I know how you are going to vote and I have a feeling this is going to be a hung jury."

In response to the concerns expressed by the foreperson's note, the court then interviewed the juror at issue, Richard Lewis. Particularly, the court asked Lewis about the allegation that he had told other jurors during the trial that he believed that there would be a hung jury. Lewis remarked, "Just basically [I] made a comment that I hoped it wasn't a hung jury, because I didn't have the time to sit around and wait and just trying to second guess, wondering what everybody was thinking more than I think on the second issue." The trial judge did not seek further elaboration from Lewis. The trial judge did not ask when or where the conversation took place, nor did the judge ask Lewis to whom he was speaking at the time he made the statements. In addition, the trial judge did not ask Lewis whether he, Lewis, could follow his oath as a juror or whether he could follow the court's instructions.

The trial court then excused Lewis. After doing so, the trial court concluded that Lewis "did not deny the allegation that we received through [the foreperson], and . . . it was a clear violation of this Court's order."

However, the trial court did not elaborate as to whether its finding meant that Lewis was unwilling to abide by his oath as a juror, whether he was unable to follow the court's instructions, or whether the court found him

---

6. The record does not reveal when this request was made, only that it was within the hour between the request for the yardstick and the request for a copy of the jurors' oath.

deficient as to both matters. Thus Lewis was excused from the jury.

As a substitute juror, the court recalled one of the alternate jurors who had been dismissed the day before. After ascertaining that the alternate juror had not discussed the case since her dismissal, and that the remaining jurors were each willing to begin deliberations anew, the court permitted them to do so.

The alternate juror was then seated with the other jurors in the jury deliberation room. About three and one-half hours later, the jury announced its verdict, finding Garcia guilty as charged.

## C. The Judgment On Review

The court of appeals affirmed the conviction. *See Garcia*, 964 P.2d 619. It held that there was ample record support for the trial court's determination that the juror at issue had deliberately disobeyed the trial court's instruction not to discuss the case with the other jurors before the jury was charged to enter into deliberations. *See id.* at 625. On this record, such a determination, the court of appeals added, is sufficient to justify the removal of a deliberating juror and the substitution of an alternate juror. *See id.* at 624. Based on our examination of the record and relevant decisional law, we disagree and reverse.

## II.

We have twice visited the issue of juror disqualification and substitution since 1989. In *People v. Burnette*, 775 P.2d 583, 587 (Colo.1989), we determined that substituting an alternate juror for one who had already begun deliberating violated prior versions of both Crim. P. 24(e) and section 16–10–105, 8A C.R.S. (1986). We further held that such a violation creates a presumption of prejudice to the defendant's right to a fair trial. *See id.* at 587–88. This presumption arises, we concluded, because "there is a real danger that the new juror will not have a realistic opportunity to express his views and to persuade others." *Id.* at 588. Further, the new juror will have missed the dynamics of the

7. We did not determine in *Carrillo* whether or

first deliberations, which set the other jurors on the path to a verdict. *See id.* Of course, that juror will not have the benefit of the replaced juror's views. *See id.* And, finally, we voiced our concern that "a lone juror who cannot in good conscience vote for conviction might be under great pressure to feign illness in order to place the burden of decision on an alternate." *Id.* Accordingly, we held that the presumption of prejudice "can be overcome only by a showing that the trial court took extraordinary precautions to ensure that the defendant would not be prejudiced and that under the circumstances of the case, the precautions were adequate to achieve that result." *Id.* at 590.

Under the facts of *Burnette* itself, we held for several reasons that the presumption of prejudice had not been overcome. First, the original jury deliberated for four and one-half hours, while the reconstituted jury deliberated for only one-half hour the first day and a portion of the next. *See id.* Second, while the trial court instructed the jurors to begin deliberations anew, it did not question the jurors individually to ascertain whether or not they could, in fact, do so. *See id.* at 590–91. Third, the trial court failed to inquire whether the original jurors could accept the alternate juror's assertions of a nonconforming view. *See id.* at 591. Fourth, the alternate juror had been discharged for about twenty-four hours before being recalled, he was not told at discharge to refrain from forming an opinion based on information he might obtain after his discharge, and he was not questioned upon recall about his activities since his discharge or his present ability to serve as a fair and impartial juror. *See id.* In sum, we held that the trial court "received no assurances ... that the ability of the reconstituted jury to render a fair verdict would be unimpaired by the substitution." *Id.*

Ten years later, in *Carrillo v. People*, 974 P.2d 478, 491 (Colo.1999), we reaffirmed *Burnette*'s holding that substituting an alternate juror for a juror who has already begun to deliberate raises a presumption of prejudice to the defendant's right to a fair trial.[7]

not dismissing a juror and substituting an alter-

Based on the facts of *Carrillo*, however, we reached a different result.

In that case, the jury announced a guilty verdict. *See id.* at 482. Then, when the jury was polled, one of the jurors insisted that his verdict was not guilty. *See id.* During an in camera interview, the inconsistent juror admitted that he was unable to hear all of the evidence or the court's instructions. *See id.* at 482–83. The trial court excused him from further deliberations and substituted for him an alternate juror who had been dismissed from the courtroom, but not from jury service, the day before. *See id.*

Under these circumstances, we held that the presumption of prejudice to the defendant had been rebutted. *See id.* at 493. Most importantly, the hearing problem clearly had not been manufactured in an effort to remove a dissenting juror from the panel. *See id.* at 492. Both parties had offered to stipulate to remove him for cause during voir dire because of that very problem. *See id.* And, during his in camera interview, the juror admitted that the problem was his hearing impairment. *See id.* This interview also failed to reveal any undue pressure on him from the other jurors to conform his views concerning the verdict to theirs. *See id.* These facts, we held, were sufficient to demonstrate that removing the juror during deliberations was not unfairly prejudicial to the defense. *See id.* at 493.

Further, the trial court in *Carrillo* took extraordinary precautions in reintroducing the alternate juror. It did not discharge the alternates from jury service when the jury retired to deliberate and warned the alternates that they were still obligated to follow the court's instructions. *See id.* at 492. When it recalled one of the alternates, the trial court questioned her thoroughly concerning how well she had followed those instructions. *See id.* The trial court also told the eleven remaining jurors that they had to begin deliberations anew at that point, and asked each of them individually if they thought that they could do so. *See id.* Finally, the reconstituted jury deliberated for six hours, as opposed to the original jury, which deliberated only for four. *See id.* During these six hours, the reconstituted jury tore up their prior notes and sent them to the court and asked a question concerning the jury instructions, indicating that they were, indeed, starting deliberations anew. *See id.* at 493. Thus, we held that the State had successfully rebutted the presumption of prejudice from the substitution of jurors after deliberations had commenced. *See id.*

### III.

■ Despite our ultimate holding in *Carrillo*, we expressed special concern about replacing jurors in cases in which "the juror excused was a lone holdout for acquittal":

> Courts should particularly strive to avoid the practice of mid-deliberation substitution of a juror when the deliberation process has already progressed to the stage of announcing verdicts and where the juror who is the source of non-unanimity is the one who is subsequently excused.

*Id.* at 491. In such cases there is a danger that the court's act of dismissing the juror "will be interpreted as a comment on the merits of the case—in effect, that the juror is being excused because, in the court's opinion, the juror reached the wrong result." *Id.*

We find this very concern of particular force in this case. Here, the trial court's inquiry was incomplete. The record fails to show a sufficient inquiry of juror Lewis as to whether he was willing to follow the trial judge's instructions prior to deliberations or during the course of deliberations. Therefore, on this record, we are compelled to reverse the jury's verdict. *See Morgan v. People*, 624 P.2d 1331, 1332 (Colo.1981) ("The placing of ... discretion in the trial judge does not ... permit appellate courts to abdicate their responsibility to ensure that the requirements of fairness are fulfilled.").

---

nate juror during the course of deliberations violates our current statute and rule, as that issue was not relevant to the outcome of the case. *See Carrillo*, 974 P.2d at 488, 490. Whether or not a trial court has the power to order such a substi-

tution, the substitution raises a presumption of prejudice to the defendant. *See id.* at 490. Since we simply follow the principles announced in *Burnette* and *Carrillo*, we need not and do not decide the issue left open in *Carrillo*.

## A.

■ Whatever is said during deliberations is not an appropriate subject of inquiry. "[T]he secrecy of jury deliberations is a 'core principle' in the American system of justice...." *People v. Kriho*, 996 P.2d 158, 167 (Colo.App.1999). Hence, "[t]he mental processes of a deliberating juror with respect to the merits of the case at hand must remain largely beyond examination and second-guessing, shielded from the court as much as from the eyes and ears of the parties and the public." *United States v. Thomas*, 116 F.3d 606, 620 (2d Cir.1997). This "protects jurors, *especially lone holdout jurors*, from intimidation and from fear that their inability to explain why they favored acquittal, despite a strong prosecution case, might result in criminal charges being brought against them." *Id.*[8] (emphasis added).

Here, the trial court impermissibly invaded the jury's deliberations. Although it declined to do so upon receiving the first note from the foreperson complaining about Lewis, upon receiving the second note—even more detailed than the first regarding the content of the jury's deliberations—the court decided to interview the foreperson about these complaints. The court asked her specifically if the juror was refusing to follow the court's instructions or his oath as a juror, apparently referring to the juror's conduct inside the deliberation room. This was error.

> Where the duty and authority to prevent defiant disregard of the law or evidence comes into conflict with the principle of secret jury deliberations, we are compelled to err in favor of the lesser of two evils— protecting the secrecy of jury deliberations at the expense of possibly allowing irresponsible juror activity.

*Thomas*, 116 F.3d at 623.

## B.

■ The only allegation of impropriety remaining for investigation is whether Lewis violated the court's instruction not to discuss the case with other jurors before official jury deliberations had begun. As to this allegation, the only information that the court had was the hearsay statements from the foreperson. These hearsay statements also failed to specify the date, time, location, or context of the juror's alleged remarks. The court did not learn of these details by interviewing any of the jurors with whom Lewis allegedly attempted to discuss the case, nor did the trial judge attempt to learn that information directly from Lewis. The only direct evidence of Lewis's statements was Lewis's characterization of them. According to Lewis, he did little more than express to some other jurors his hope that the jury did not hang. Such an innocuous remark would not have justified Lewis's removal from the jury. *See People v. Sandoval*, 733 P.2d 319, 321 (Colo.1987) (expression of concern about some facet of case or jury service should not result in juror's automatic exclusion); *cf.* §§ 16–10–103(1)(j) (biased prospective juror must be removed for cause, unless court is satisfied that juror will render impartial verdict according to the law and evidence), –106 (sworn juror may be removed from jury if because of "illness or other cause," the juror becomes unable to continue until verdict is reached); Crim. P. 24(b)(1)(X) (biased prospective juror must be removed for cause, unless court is satisfied that juror will render impartial verdict according to the law and evidence). The trial court may have disbelieved Lewis's characterization of his conduct, but it did not have any positive, non-hearsay evidence that Lewis's conduct was inappropriate.[9] The court never asked Lewis the critical question—whether or not he could follow the court's instructions. Under these circumstances, we must presume that the defendant was prejudiced by the removal of the one juror unwilling to convict her.

## IV.

"Trial by jury in criminal cases is fundamental to the American scheme of jus-

---

**8.** Juror Lewis expressed that very fear following his explanation of what happened: "I don't see how [commenting that I hoped it would not be a hung jury] could be some kind of crime...."

**9.** Even the foreperson's characterization of Lewis's pre-deliberation conduct, based on hearsay statements from other jurors, failed to establish that Lewis had done anything more than speculate about what the other jurors were thinking and suggest to a few of them that not all of the jurors were going to be able to agree on a verdict at the end of the case.

tice...." *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *see also Burnette*, 775 P.2d at 586 ("The right to a fair trial by an impartial jury is one of the fundamental constitutional rights of a criminal defendant."). Even before that right was secured by the United States Constitution, it had existed in England for centuries. *See Duncan*, 391 U.S. at 151, 88 S.Ct. 1444. "[T]he founders of the English law have, with excellent forecast, contrived that ... the truth of every accusation ... should ... be confirmed by the unanimous suffrage of twelve of his equals and neighbours, indifferently chosen and superior to all suspicion." *Id.* at 151–52, 88 S.Ct. 1444 (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 349 (Cooley ed. 1899)) (internal quotation marks omitted).

In combination with an independent judiciary, juries protect our citizens from arbitrary government action. *See Duncan*, 391 U.S. at 156, 88 S.Ct. 1444. Their continued and uniform existence in the United States reflects "a profound judgment about the way in which law should be enforced and justice administered." *Id.* at 155, 88 S.Ct. 1444. Furthermore, juries fairly drawn from the community are "critical to public confidence in the fairness of the criminal justice system." *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

The case before us raises serious questions about the propriety of excusing a juror after deliberations have begun. It therefore also raises concerns about the way in which the courts should protect the institution of the jury as the barrier between the government and its citizens. We are concerned that in this case it may appear that a conviction was secured unfairly. In addition, we are equally concerned about a trial court removing a deliberating juror in a manner that appears to facilitate the rendering of a guilty verdict. Even if not truthful, such appearances have the potential to erode the public's confidence and trust in our criminal justice system. Whenever it appears that a jury may be reconstituted in order to reach a particular result, the guarantee of a fair and impartial jury is meaningless to a defendant and creates unwarranted mistrust and suspicion among members of the public.

Therefore, in order to protect the core importance of the deliberative process, we reverse. The intrusion into the jury deliberation process by the trial court under the circumstances of this case cannot be justified on this record.

## V.

Accordingly, we are compelled to reverse the judgment of the court of appeals and to remand this case to that court with instructions that it vacate the jury verdict below and return this case to the trial court for a new trial.

Justice KOURLIS dissents, and Chief Justice MULLARKEY and Justice RICE join in the dissent.

Justice KOURLIS, dissenting.

I respectfully disagree with the majority's conclusions in this case and accordingly dissent. Here, the trial court concluded that juror Lewis had expressed a judgment about the case prior to deliberations, and that he evidenced an unwillingness to consider all of the evidence or follow the court's instructions. Those reasons clearly are adequate for dismissal of a juror. Because the information came to light after the jury retired to deliberate, the trial court took a number of corrective steps designed to protect the jury's mental processes and deliberations. In my view, those precautions were adequate to protect the defendant's rights and the trial court did not err in replacing juror Lewis with an alternate juror.

## I.

### A.

I begin with the axiom that a trial judge is in the best position to determine whether a juror can be impartial. *See, e.g., People v. Rhodus*, 870 P.2d 470, 477 (Colo.1994). As appellate courts, we defer to the trial judge because of the unique factors that contribute to an assessment of fairness. Human dynamics, tone of voice, body language, and facial expression all play a part in evaluating

credibility. Because those factors cannot come alive in a written transcript, only a trial judge is in a position to take them into account in measuring the capacity of a juror or prospective juror to be fair to both sides and to follow the court's instructions. *See id.; see also People v. Fuller,* 791 P.2d 702, 706 (Colo.1990).

If a trial judge determines that a juror is unwilling or unable to deliberate impartially, the trial court should excuse the juror. *See Morgan v. People,* 624 P.2d 1331, 1332 (Colo. 1981). A juror who refuses to follow the court's instructions and fulfill his duties should be replaced with an alternate, even if deliberations have already begun. *See People v. Metters,* 72 Cal.Rptr.2d 294, 311 (Cal. Ct.App.1998) (holding that a judge properly excused a juror who formed an opinion and attempted to sway another panel member before deliberations began and who refused to deliberate), *cert. granted,* 75 Cal.Rptr.2d 684, 956 P.2d 1137 (Cal. June 10, 1998) (No. S069442); *Dixon v. State,* 524 N.E.2d 2, 4 (Ind.1988) (approving the substitution of an alternate for a juror who refused to deliberate); *McKenna v. State,* 96 Nev. 811, 618 P.2d 348, 349 (1980) (finding no error in the substitution of an alternate for a juror who could not follow instructions because she could not be impartial).

### B.

When circumstances arise that call for removing a juror during deliberations, we recently delineated the steps a judge must take to secure the defendant's continuing right to a fair trial. *See Carrillo v. People,* 974 P.2d 478 (Colo.1999). The procedures followed by the trial court in *Carrillo* in excusing a juror who had been unable to hear the evidence closely mirror the procedures undertaken by the trial court here. The trial courts in both cases specifically questioned the juror in camera to ensure that the cause of the juror's dismissal "was not manufactured in response to undue pres-

sure from the other jurors." *Id.* at 492 (responding to concerns that a lone juror could feign illness or another excuse to avoid his decision-making responsibility). Both trial courts then conducted colloquies to determine whether the alternate juror followed the court's instructions during the panel's initial deliberations, and whether the seated panel could set aside their previous discussions and begin fresh deliberations. *See id.*

The facts of the present case arguably are more difficult to resolve than *Carrillo* because the reasons for juror Lewis's dismissal were not beyond his control. However, this trial court went one step further than the *Carrillo* trial court in ensuring a fair substitution of jurors. In *Carrillo,* the court failed to inquire whether the remaining jurors could be receptive to any attempts by the alternate juror to assert a nonconforming view. *See id.* (finding that a failure to make this inquiry, however, did not undermine the overall rebuttal of the presumption of prejudice to the defendant). In this case, the jury unanimously indicated not only that it could begin deliberating anew, but also that it could be receptive to any dissenting views by the alternate juror. Considering the amount of time that passed before the substitution,[1] the precautions taken by the trial court in questioning the foreperson of the jury and instructing the other jurors, together with the length of time that the reconstituted jury deliberated, the presumption of prejudice to the defendant was overcome. *See, e.g., People v. Burnette,* 775 P.2d 583 (Colo.1989).

### II.

### A.

Despite the precautionary measures taken by the trial court, the majority concludes that the trial court should not have excused juror Lewis because of the danger of judicial interference in deliberations by inquiring into the mental processes of the jurors, or by dismiss-

---

1. The majority presumes that the jury deliberated after sending out each question and receiving the judge's answers because the record did not indicate otherwise. *See* maj. op. at 3. However, I believe that the record supports a conclusion that the jury was not engaged in full deliberations that included all jurors during this time. The foreperson specifically testified "there's no discussion. The person is really even unwilling to even participate in any type of a discussion. We can't deliberate. We haven't been able to from the time we started."

ing a holdout juror who disagreed with the other jurors. *See* maj. op. at 6–7. In circumstances that call for the substitution of a juror during deliberations, courts certainly should be alert to the "lone juror" problem. In some instances, the removal of a lone holdout juror may create an inference that the trial court is speaking to the merits of the case. *See Carrillo,* 974 P.2d at 491. However, I find nothing in this record to support an inference that the trial court dismissed Lewis for any inappropriate reason.

That Lewis may have been the only juror to vote for an acquittal does not immunize him from dismissal, regardless of misconduct. *See People v. Hightower,* 77 Cal.App.4th 1123, 92 Cal.Rptr.2d 497, 519 (2000) (holding that a trial court could use its discretion to dismiss a juror for failure to impartially deliberate even though the juror was unconvinced of the defendant's guilt); *see also United States v. Barone,* 114 F.3d 1284, 1308–09 (1st Cir.1997) (finding that the evidence showed the holdout juror was dismissed for other misconduct, and therefore, his removal was not error); *United States v. Huntress,* 956 F.2d 1309, 1313 (5th Cir.1992) (determining that the record contained no evidence of improper conduct regarding dismissal of a holdout juror). Trial courts must be vigilant to the possibility that a panel's frustration over disagreements on the merits may color their description of deliberations, just as courts must take care not to subordinate their adjudicatory function to jurors' desires. *See Hightower,* 92 Cal.Rptr.2d at 517. But unless the circumstances of the case indicate an improper motive, the mere possibility that the juror was excused for holding out does not dictate a mistrial. *See id.* In the absence of evidence in the record, a reviewing court should not assume that the trial court acted on impermissible grounds. *See id.* at 516.

> If the trial court adequately addresses these hazards, we cannot agree ... that it is barred from removing a juror merely because the record raises a possibility that doubts by the questioned juror were a causative factor in the juror's removal. Rather, if the court finds that a juror is unable or unwilling to perform his or her duties, the court may and must remove

that juror whether or not the juror also entertains doubts about the sufficiency of the prosecution's proof. Provided it performs its functions with circumspection and care, so as to avoid any improper influence on the deliberative process, the court commits no error by removing a juror whose doubts ... rest upon fixed categorical preconceptions which prevent him from weighing and deliberating over the evidence or following the court's instructions.

*Id.* at 517–18.

The record indicates that the trial court excused juror Lewis because he clearly violated the court's orders, not because he was a holdout juror endangering a verdict. There was evidence, both from the notes from the jury foreperson and from the in camera discussion with her, that juror Lewis prejudged the case before the deliberations began; and that he had attempted to engage other jurors in conversation about the case before deliberations. Lewis admitted to making statements to other jurors regarding a hung jury. The trial court reasonably found that these comments amounted to more than "an innocuous remark." *See* maj. op. at 7. Further, the court learned of additional, consistent misconduct. Juror Lewis, according to the foreperson, was unwilling to listen to the viewpoints of the other jurors and unwilling to consider all of the evidence. These facts supported the trial court's decision to remove juror Lewis, because a juror who cannot fully and fairly deliberate cannot serve.

The record demonstrates that the trial court in this case was cognizant of the "lone juror" problem, and directly addressed it. After interviewing the foreperson and Lewis, the trial judge determined that a "neutral reason"—Lewis's statements before deliberations began—warranted dismissal of Lewis. The trial court concluded: "there is no occasion, from anything that we heard, that this jury wishes to isolate this person." The judge further explicitly stated to the jury that no inference should be drawn from his decision to remove Lewis. This indicates that the trial judge considered the source of the allegations against Lewis and any impact

of his dismissal on the reconstituted panel. Coupled with his directions to begin fresh deliberations, the record demonstrates that the judge sufficiently dealt with any appearance of a "lone juror" problem.

### B.

The majority further concludes that the trial court erred in allowing the reconstituted jury to return a verdict because the judge's investigation of Lewis's misconduct impermissibly inquired into the substance of the jury deliberations. *See People v. Boulies,* 690 P.2d 1253, 1256 (Colo.1984) (stating that jury deliberations should remain secret). I disagree with the majority's conclusion that, on these facts, the scope of the trial court's inquiry extended into any jury discussions on the merits of the charges.

The record demonstrates that the judge investigated only the allegations of juror misconduct. Before bringing the foreperson into chambers for questioning, the trial judge indicated how he would limit his inquiry:

> It should be clear that the foreperson or foreman of the jury will be told up front by me that we are not interested, nor do I want to hear anything concerning opinions of guilt or innocence, or which witness to believe or what evidence to follow. I simply want to get a clearer position, if we have a situation where a juror can and ought to be removed, or whether there is simply a dead lock situation and require the jury to go back to the drawing board.

When the judge interviewed the foreperson, he specifically admonished her to limit her description of what took place in the jury room. "I want to make it clear we don't want to get into any discussions now as to guilt or innocence or anything else concerning the deliberation process in regard to sufficiency of evidence or particular evidence or believes [sic] and so forth."

The judge proceeded to question the foreperson briefly regarding Lewis's refusal to deliberate and his attempt to influence other jurors before deliberations began. The judge did not make any inquiries into whether Lewis's statements stemmed from a difference of opinion with the other jurors, and

the foreperson did not offer any such information. I, therefore, disagree with the majority that when the trial judge questioned a juror's ability to follow instructions that he necessarily reached into the jury's deliberations. Trial judges have a responsibility to examine allegations of misconduct. *See, e.g., People v. Fears,* 962 P.2d 272, 283 (Colo.App. 1997). Here, the trial judge conducted a proper investigation under difficult circumstances. He adequately traversed the fine line a court must walk between making an adequate inquiry into misconduct, and not intruding into the substance of jury deliberations.·

The majority also recommends that the trial judge should have elicited more factual information about the misconduct, in part by interviewing other jurors regarding whether or not Lewis attempted to engage them in predeliberation discussions. In my view, the court made a sufficient inquiry when he questioned only the foreperson and relied upon her statements and the notes from the jury, in combination with Lewis's own statements.

The majority also states that the court should have asked Lewis the dispositive question of whether he could follow the court's instructions of law. In my view, such a question was conclusory at that point, and the trial judge was entitled to rely upon the information he already had received in drawing his own conclusion that Lewis's conduct to that point in time demonstrated a patent unwillingness to follow instructions.

Judges can only rule on the case as it comes before them. Here, there can be no doubt that if the trial court had earlier learned of juror Lewis's attempts to engage the other jurors in deliberations prior to the end of the presentation of evidence, or of Lewis's prejudgment of the case, the court would have excused him and replaced him with another juror. The fact that the court did not learn of that misconduct until deliberations began heightened the need for care and attention to procedure, but did not change the result. The trial judge can only rule on the evidence of juror misconduct when he or she learns of it. Jurors are generally unwilling to report transgressions

of another juror. Trial judges must be able to use their discretion to address juror misconduct during later stages of the proceedings without being compelled to grant a mistrial.

### III.

Juries are the bulwark of our system of justice. They comprise the voice of the defendant's peers, and the conscience of the community. For the jury system to deserve and earn the respect of society, jurors must follow the law as set out in the court's instructions. If a juror states that he is unwilling to follow the court's instructions, or if the juror demonstrates by his conduct an unwillingness to follow those instructions, then he cannot serve. *See Morgan,* 624 P.2d at 1332.

Because I would defer to the trial court's findings and because the procedures the trial court used sufficiently protected the integrity of the jury process, I would affirm the court of appeals, and therefore, respectfully dissent.

I am authorized to state that Chief Justice MULLARKEY and Justice RICE join in this dissent.