92 Cal.Rptr.2d 497 (2000)
77 Cal.App.4th 1123
The PEOPLE, Plaintiff and Respondent,
v.
Felix D. HIGHTOWER, Defendant and Appellant.
No. A081424.
Court of Appeal, First District. Division 4.
January 28, 2000.
As Modified February 8, 2000.
Review Granted May 10, 2000.
*500 David Y. Stanley, Truckee, under appointment by the Court of Appeal, for Appellant.
Bill Lockyer, Atty. Gen., David P. Druliner, Chief Asst. Atty., Ronald A. Bass, Senior Asst. Atty. Gen., Michael E. Banister, Deputy Atty. Gen., Catherine A. Rivlin, Supervising Deputy Atty. Gen., for Respondent.
Certified for Partial Publication.[*]
SEPULVEDA, J.
Defendant Felix D. Hightower was convicted of the murder of his mother and of arson in connection with a fire which led to the discovery of her body. On appeal he contends that the trial court erred by excusing a juror who professed during deliberations a categorical disbelief that a son could murder his mother under the circumstances shown by the evidence. The appeal also presents the question whether the trial court properly stayed sentence on the arson charge under Penal Code section 654.

BACKGROUND
Shortly after 6:00 o'clock on the morning of Monday, September 3,1990, a fire broke out in the apartment occupied by defendant and his mother, Mary Hightower. A neighbor, seven years old at the time of *501 the fire, testified that he was awakened by sirens and looked out his window to see defendant running from the alley in front of the apartment. Fire Fighters entering the apartment found Ms. Hightower and her dog, both dead, in the bedroom. Ms. Hightower had been stabbed or cut approximately 63 times and had died as a result of the stabbings. Her death occurred one to three days before the fire. The fire had been set deliberately on the bed and at another point near the bed.
Ms. Hightower was last seen alive on Friday evening, August 31, when she agreed to join friends the following morning on a fishing and pea-picking trip. When the friends came by to pick her up on Saturday morning, she did not answer her door. Her car was missing, though she herself did not drive and typically got defendant to drive her.
At about 6:30 on Saturday morning, defendant presented himself at an Oakland hospital emergency room with fresh cuts on his hands. He told the triage nurse that he had cut himself with a knife about an hour earlier. He did not appear to be under the influence of drugs. He received 17 stitches and was released. Blood later found at the murder scene would prove to have genetic characteristics that did not match Mary Hightower's blood and did not match 99.75 percent of the African-American population, but did match defendant's blood.
On Saturday morning a friend of Mary Hightower's went by her apartment and saw defendant and a stranger loading a television set into a truck. When the friend asked appellant where his mother was, he replied that she had gone to pick up a check. Later that day, Ms. Hightower's sister questioned defendant about his mother's whereabouts. Defendant nervously said that she had gone fishing with a friend. Defendant struck the sister as "jumpy" and "nervous." He looked like he had been using drugs.
There was testimony that defendant had a "drug problem"; had previously taken a television from his mother's house; and had been heard arguing with her about drug use, missing items, and money. Witnesses also reported that defendant and his mother seemed to have a close relationship; that they generally got along and cared for one another as son and mother; that they had never been seen engaging in any physical conflict; and that their arguments were a normal parent-child thing.
At the conclusion of a first trial in 1993, a jury found defendant guilty of murder and arson and found the allegation of weapons use true. This court reversed the judgment on grounds not relevant here. (People v. Hightower (1996) 41 Cal.App.4th 1108, 49 Cal.Rptr.2d 40.)
On remand, the matter was again tried to a jury, which again convicted defendant of second degree murder and arson and found true the allegations that defendant used a deadly weapon and acted with intent to inflict great bodily injury. The court initially sentenced defendant to a term of 19 years to life, consisting of 15 years to life on the murder charge, plus a consecutive 1-year enhancement, plus a consecutive 3-year term on the arson count. During the pendency of this appeal, however, the court modified the sentence to direct that defendant be sentenced to four years on the arson count, "stayed pending completion of service of sentence on the 1st count at which time said stay shall become permanent." The net result was a sentence of 16 years to life, with an additional stayed sentence of 4 years on the arson charge.
Defendant brought this timely appeal.

DISCUSSION

I.

REMOVAL OF JUROR

A. Proceedings.

Defendant's sole challenge to the guilty verdict is that the trial court erred in discharging a juror during deliberations *502 and substituting an alternate juror in his place.[1]
On the morning of the third day of deliberations, the jury submitted a note to the court which, though subsequently misplaced, was characterized for the record by agreement of court and counsel. The note requested guidance on how to proceed when a juror is "using general feelings and not following instructions ... based on a fundamental belief that the love between a mother and son is strong." It asked whether such an approach constituted a "bias" which should be "set aside." In response, the court instructed the jury as follows: "The determination of the facts in this case is to be made by the jury only from the facts that have been proven in this trial directly or circumstantially or by stipulation. [¶] In making such determinations, the jury must not be influenced by emotions that are not evidence, such as pity for a defendant or prejudice against him, and the jury's verdict must similarly not be influenced by other feelings of mere sympathy, passion, conjecture, prejudice not proven as facts by the evidence in this case. [¶] It is permissible for the jury to consider the relationship between the defendant and Mary Hightower to the extent it was presented in the evidence. Any assumptions about parent and child relationships in general are not in evidence, and such assumptions may not influence the jury's findings of fact or the jury's verdict."
After lunch the jury submitted a second note, signed by Juror No. 1 as foreperson, expressing concern that one or more unidentified jurors were incapable of following the court's instructions in that, instead of discussing evidence, they were discussing "feelings," "suppositions," and "unreasonable interpretations of the evidence." (Underlining in original.) The note reported that the juror had also expressed concerns that the trial was creating severe job and marital difficulties and depriving the juror of sleep. The note concluded that the juror might be unsuited to the particular case in light of "an internal belief system, [whether] personal or cultural, which is precluding that an individual may be capable of committing the charged crime."[2]
*503 The prosecuting attorney requested a hearing into juror misconduct. Defense counsel responded that that he could not see how the occurrences described in the note rose to the level of misconduct, and that the court would be "treading on very thin ice by intruding into the jury's deliberative process at this point with the scant information we have." The prosecuting attorney replied that "we need to find out the extent of the misconduct if in fact it exists. [¶] So I would ask that we identify this person and find out." Defense counsel rejoined that "any inquiry at this point should be limited to the question of whether the jurors believe that further deliberations will result in a verdict or whether they think a verdict is possible in this case."
Implicitly granting the prosecution request, the court convened a hearing in chambers in which the court, and then both counsel, questioned the foreperson, Juror No. 1. Juror No. 1 disclosed that the subject of the note was Juror No. 8, whom she described as Vietnamese. Juror No. 1 said that the other jurors felt Juror No. 8 "isn't able to consider the evidence based on the instructions given to us, meaning [he was] not properly considering the evidence without bias, without sentiment, without pity. [He didn't] seem to be able to evaluate the evidence." Juror No. 8 did not refuse to follow instructions, and indeed appeared to feel that he was following thembut, said Juror No. 1, "He doesn't seem to be able to separate feelings, sentiment and bias from simply evaluating the evidence." Juror No. 8 was vague about why he had doubts, but they seemed to go to the issue of motive. He gave reasons for his doubts, but did not attempt to identify weaknesses in the position of the majority jurors, and did not attempt to "assign facts to his reasons." The other jurors had asked him to give reasons, but "he feels the burden is on us to convince him." The foreperson said that Juror No. 8 had gone beyond the facts shown by the evidence to "[s]peculat[e] as to who he thinks may have killed Mary." He also "interject[ed] a lot of his own personal feelings, his own personal issues into deliberation which we keep trying to get out of deliberation. And unfortunately we feel it's a lot of his own personal feelings that keep coming into play where he can't separate personal feelings and just deliberate.... [¶] All he says is he has a doubt. He thinks his feelings are valid. I really don't think he is capable of separating those things."
Juror No. 1 also reported remarks by Juror No. 8 that as a result of the trial he felt he might have lost his job, and maybe his wife, and was not sleeping at night. Juror No. 1 felt the lack of sleep might have made it difficult or impossible for him to follow instructions because "he doesn't at times make sense, we don't feel he's reasonable. He lacks clarity."
Questioned by the prosecuting attorney, Juror No. 1 said that Juror No. 8 described himself as "not articulate enough" to identify evidence or facts supporting his doubts. As Juror No. 1 described it, "[W]e have a juror who has a fundamental belief in the love between a mother and son which goes to motive which is fundamental. I don't know that this juror is capable of rendering a decision and looking at the evidence where a son has killed a mother and thinking that it's possible." Juror No. 8 had expressed this inability "[i]n so many words," said Juror No. 1. "[H]e specifically said had he known it was the murder of a mother by a son he probably shouldn't have been on the jury.... [¶] [b]ecause he cannot imagine what circumstanceshe cannot imagine a son doing that." (Italics added.)
*504 Asked by defense counsel whether she thought there was a reasonable probability that further deliberations could produce a verdict, Juror No. 1 said that based on her 20 years "in sales," the juror in question was exhibiting "a fundamental bias. It is not possible to move him, to make a decision.... We can't go around it, we can't go over it, we can't move him. I cannot get him to look at facts or evidence. It's a fundamental bias."
After completing the questioning of Juror No. 1, the court observed "for the record" that Juror No. 8 "didn't appear to be awake during much of the argument in this case. I may be wrong. He may have just been simply resting his eyes, but he did not appear to be awake." The court then stated that it considered excusal of Juror No. 8 justified by his statement that if he had known the case involved a son's killing of his mother, he shouldn't have been on the jury. Defense counsel at first appeared to concur, stating, "That's right. He did know that this was an allegation of a son killing his mother." However, he then stated that none of the foreperson's statements pointed to misconduct and that to take the purported quote concerning his suitability to be on the jury "out of context ... would lead us down the wrong path." Defense counsel asserted that it was "incumbent to at least talk to [Juror No. 8] because we've got allegations."
The court then questioned Juror No. 8, beginning with, "Probably the most important matter is the report that in the jury room you have made a comment that you couldn't imagine a son killing his mother. Did you make such a comment?" Juror No. 8 replied, "No. I say ... I say that love, a son cannot kill his mother like that in the normal condition." He also denied saying that he shouldn't have been on the jury had he known the defendant was charged with killing his mother. He denied that he had lost his job or that any concern about his job affected his ability to be a juror and to deliberate. He said his statements about marital problems were casual jokes, not meant seriously, and did not interfere with his ability to deliberate and be a juror. Initially he seemed to confess that he suffered insomnia, but attributed it to working very hard and said that it had nothing to do with the trial. Somewhat later, he denied having insomnia at all, claiming that he had only said otherwise "for the sake of conversation."
Questioned by the prosecuting attorney, Juror No. 8 appeared to acknowledge stating that he shouldn't be on a jury involving a son accused of killing his mother, adding, "It's very hard for me to believe a loving son can kill his mother with so many stab like that." In response to questions from defense counsel, he said he found it hard to believe a son could kill his mother "like that."[3] However, he said he could imagine *505 a case where a son was charged with killing his mother and he would vote guilty.
Juror No. 8 could not recall whether he said anything in the jury room about not having realized the case concerned a son's alleged killing of his mother, but offered the explanation that "maybe I say that to defend myself. I get a lot of pressure." The court asked him whether he felt he could "be a fair juror in a case where the charge to the defendant is that he's murdered his mother." He replied, "I don't know what it mean fair. To me I can be fair but other people say I am not fair." He stated that he had paid attention to all the evidence, had it in mind, and had tried to explain his point of view to the other jurors. They professed an inability to understand him because he had a problem with the language, and suggested getting an interpreter so he could speak his native language. He told them he didn't have a language problem, only maybe a problem with communication. They also told him he had a cultural problem. He said, "I get a lot of pressure, a lot of personal attack."
Juror No. 8 responded ambiguously to questions concerning the standard of proof to which he would hold the prosecution.[4] Noting the seeming inconsistency of his answers, the court asked, "In a case where, as here, the charge is that a son has murdered his mother, would you require more from Mr. Golde than proof beyond a reasonable doubt to bring in a verdict of guilty?" Juror No. 8 replied, "I say no, because I only have a few evidence but I weigh that evidence very heavily, so that mean it very hard to prove.... Like I understand when we sit in court we listen a lot of evidence, maybe a hundred evidence or a thousand evidence, but every people weigh evidence differently, but I weigh like only a few evidence heavily, so it make me have some doubt." The prosecutor then asked whether Juror No. 8 would require an eyewitness in every case, or whether he could base his decision on circumstantial evidence. Juror No. 8 replied, "Like sometime we don't need an eyewitness."
After concluding its questioning of Juror No. 8, the court questioned, and permitted counsel to question, each of the other jurors. *506 The court commenced each juror's questioning, as it had the questioning of jurors No. 1 and No. 8, with an admonition not to disclose the contents of deliberations. The court also concluded each juror's questioning with an admonition not to disclose the questions asked of that juror, or the answers given.
In the course of this questioning, ten jurors reported that Juror No. 8 made comments to the effect that he could not imagine or could not believe a son would murder his mother. Four of the ten recounted qualified versions of the statement, i.e., that Juror No. 8 could not imagine a "loving son" committing such an offense, or could not imagine him doing so unless he was "under the influence," or was subjected to "exorcism" or "some X-file-like forces."[5]
Five jurors recalled Juror No. 8 making statements to the effect that in view of the nature of the case, he should not, or "perhaps" should not, be serving on the jury. Two other jurors recalled comments by Juror No. 8 to the effect that he "shouldn't be here" or "d[id]n't belong." Two jurors recalled no such statement. Two were not asked. As noted above, Juror No. 8 himself initially denied making such a statement, but later said he was "unsure" whether he said something like that.
Two jurors reported hearing Juror No. 8 say that he hadn't realized the case involved accusations of a son killing his mother. Another juror inferred from Juror No. 8's statements that he had not realized the case involved such allegations. Two jurors recalled no such statement.
Six jurors reported hearing Juror No. 8 complain of insomnia or difficulty sleeping. Seven jurors reported that on one or more occasions, he appeared to be sleeping in the jury box during trial or the readback of testimony. One juror thought Juror No. 8 was sleeping in the jury deliberation room.
After completing its questioning of the jurors, the court announced its intention to "make a finding that he's excused." The prosecutor expressed support; defense counsel made a "counter' motion" to "declare a mistrial because this jury is obviously deadlocked." Finding that Juror No. 8 had committed misconduct in four respects, the court excused him.[6] It seated *507 the first alternate juror in his place, and instructed the jury to begin deliberations anew. The reconstituted jury returned a verdict of guilty.
Some time later the trial court filed a lengthy "Memorandum re Lost Jury Question and Discharge of Juror." In addition to summarizing the proceedings just described, the memorandum expressed the court's views concerning the general issues raised by such situations, and the correct handling of those issues. In addition it recited certain findings of fact, including that Juror No. 8 "was not truthful in most of his answers to the questions put to him in the in[-]chambers interview," that the court "believe[d] the testimony of the eleven jurors other than [Juror No. 8] on the subject of juror misconduct," and that the court "d[id] not believe the testimony of [Juror No. 8] to the contrary." The court also found that Juror No. 8 was biased in that he possessed deep feelings preventing him from fairly trying a case of matricide, that he willfully concealed that bias during voir dire, that he was inattentive due to sleepiness, that he should have disclosed his lack of sleep during voir dire, and that his conduct in deliberations amounted to a failure to deliberate.[7]

*508 B. Power to Replace Juror.

Defendant contends that the trial court's inquiry into Juror No. 8's conduct effected an excessive and unconstitutional intrusion into the deliberative process in that it "went far beyond an exploration of possible objective, extrinsic evidence of juror misconduct and well into the thought processes by which juror number eight had concluded that he should not vote for a verdict of guilty." He also contends that the discharge of Juror No. 8 violated his right to a unanimous jury by permitting majority jurors, aided by the court, to remove a juror not convinced beyond a reasonable doubt of defendant's guilt. These contentions raise two broader issues: (1) Under what circumstances does a trial court properly remove a juror, during deliberations, for misconduct or other cause; and (2) what procedures does the court properly employ to determine whether such cause exists? These issues have generated numerous appellate pronouncements which, unfortunately, afford little practical assistance to trial judges forced to address issues of possible juror misconduct during deliberations. A few broad principles can, however, be stated with confidence.
There is no doubt that the trial court has the power to replace an original juror with an alternate upon finding that the juror is "unable to perform his duty." (Pen.Code, § 1089; see Code Civ. Proc., § 233.)[8] Courts have found sufficient cause to discharge and replace a juror who conceals or misstates facts in response to voir dire or other questioning,[9] sleeps or *509 otherwise fails to attend to the proceedings,[10] betrays bias or a fixed prejudgment of the issues,[11] exhibits an inability or refusal to deliberate,[12] disclaims the ability or willingness to apply the law as given by the court,[13] or fails to comply with other *510 duties imposed on jurors.[14] Good cause for substitution may also be found where a juror's emotional state threatens his or her ability to receive and consider the evidence or to deliberate.[15]
Whether the circumstances of a given case present grounds sufficient to warrant removal of a juror is a question entrusted to the trial court's sound discretion, and the court's finding on that issue will be sustained if supported by substantial evidence. (People v. Johnson, supra, 6 Cal.4th 1, 21, 23 Cal.Rptr.2d 593, 859 P.2d 673; People v. Burgener (1986) 41 Cal.3d 505, 519-520, 224 Cal.Rptr. 112, 714 P.2d 1251, disapproved on another point in People v. Reyes (1998) 19 Cal.4th 229, 231, 236-239, 78 Cal.Rptr.2d 295, 961 P.2d 984.) The court's discretion "is limited, however, *511 in that the juror's inability to perform the functions of a juror must appear in the record as a demonstrable reality. (People v. Collins, supra, 17 Cal.3d at p. 696 [131 Cal.Rptr. 782, 552 P.2d 742]; People v. Thomasl, supra,] 218 Cal.App.3d 1477, 1484 [267 Cal.Rptr. 865].)" (People v. Green, supra, 31 Cal.App.4th 1001, 1011-1012, 38 Cal.Rptr.2d 401; see People v. Johnson, supra, 6 Cal.4th at p. 21, 23 Cal.Rptr.2d 593, 859 P.2d 673, quoting People v. Compton (1971) 6 Cal.3d 55, 60, 98 Cal.Rptr. 217, 490 P.2d 537; People v. Roberts (1992) 2 Cal.4th 271, 325, 6 Cal. Rptr.2d 276, 826 P.2d 274 [court's discretion "not unbounded"].)
The court here expressly found cause to remove Juror No. 8 for (1) concealing a bias which prevented him from fairly determining the truth in a case involving allegations of matricide; (2) falsely stating in voir dire that he could be a fair juror in a case involving such allegations; (3) failing to deliberate by, among other things, alluding to extraterrestrials and exorcism rather than the evidence adduced at trial; and (4) sleeping during the taking of evidence. The evidence supports the trial court's determination that good cause existed to remove Juror No. 8.

C. Cause for Initial Inquiry.

Defendant's central challenge is aimed not at the sufficiency of the record to establish cause for the removal of Juror No. 8, but at the procedures employed to develop the evidence on which the court relied. In essence he contends that the court probed too deeply into the deliberative process of the jury, violating a duty to "not to intrude into the thought processes of jurors in their deliberations." In other words, the challenge goes not to the substantive justification for the result reached, but to the process used to reach it. It is in this areadelineating the procedures a trial court may or must employ when faced with a suggestion of jury misconductthat the appellate decisions have betrayed the greatest uncertainty, if not outright confusion.
When a trial court is presented with a suggestion of possible jury misconduct, the first question is whether to investigate the matter at all. This decision is often said to be entrusted to the trial court's discretion. (People v. Bradford, supra, 15 Cal.4th 1229, 1351, 65 Cal. Rptr.2d 145, 939 P.2d 259; People v. Castorena (1996) 47 Cal.App.4th 1051, 1065, 55 Cal.Rptr.2d 151.) However, a credible suggestion of grounds for discharge in effect gives rise to a mandatory duty to investigate. "[T]he court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with a substitute. [¶]`... [O]nce a juror's [inability to perform his duty] is called into question, a hearing to determine the facts is clearly contemplated. [Citations.] Failure to conduct a hearing sufficient to determine whether good cause to discharge the juror exists is an abuse of discretion subject to appellate review. [Citations.]'" (People v. Keenan, supra, 46 Cal.3d 478, 532, 250 Cal.Rptr. 550, 758 P.2d 1081, quoting People v. Burgener, supra, 41 Cal.3d 505, 519-520, 224 Cal. Rptr. 112, 714 P.2d 1251; italics added and omitted, some bracketed material in Keenan.) [16]
Moreover, despite the trial court's supposed discretion to decide when to investigate, the applicable standard of review effectively assumes the truth of any suggestion of potentially disqualifying misconduct: "`The decision whether to investigate the possibility of juror bias, incompetence, or misconductlike *512 the ultimate decision to retain or discharge a jurorrests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial.... [¶] [A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' (People v. Ray (1996) 13 Cal.4th 313, 343 [52 Cal.Rptr.2d 296, 914 P.2d 846].)" (People v. Castorena, supra, 47 Cal.App.4th 1051, 1065, 55 Cal.Rptr.2d 151, italics added; see People v. McNeal (1979) 90 Cal.App.3d 830, 838, 153 Cal. Rptr. 706, italics added ["Once the court is alerted to the possibility that a juror cannot properly perform his duty to render an impartial and unbiased verdict, it is obligated to make reasonable inquiry into the factual explanation for that possibility."].)
It follows that a trial court errs if it fails to investigate an assertion which, if true, would justify removal of a juror. Here, grounds for an initial inquiry were adequately established by the two notes from the jury. The first stated that a juror was "not following instructions" but was "using general feelings" which other jurors felt might constitute a "bias" that the juror improperly refused to "set aside." The court did not intervene at this point, merely reminding the jury of its duties to (1) consider "only ... the facts that have been proven in this trial," and (2) "not be influenced by emotions that are not evidence." Thereafter, the foreperson submitted the second note, reporting that a juror appeared "not capable of following the instructions of the court in regards to lines of evidence," and was "not discussing evidence as presented in this court" but was instead asserting "feelings" and "suppositions not in evidence," such as that defendant was being framed. In addition, the subject juror appeared "seriously concerned that his/her job has been lost due to the trial," that "marital problems may be occurring due to the trial," and that he was "l[o]sing significant sleep at night over concerns for voting correctly." The note reported the concern of other jurors that the juror in question "may be acting under duress" in that "an internal belief system, [whether] personal or cultural" made it impossible for the juror to believe "that an individual may be capable of committing the charged crime." (Underlining and emphatic capitalization omitted.)
These notes suggested at least four possible grounds for removal: actual bias, refusal to comply with instructions, occupational conflicts, and serious emotional distress brought on by the attempt to perform a juror's duties. The court therefore acted within its discretion in undertaking an investigation of the matter.

D. Adequacy of Investigation.

This brings us to the truly difficult question: What is the nature and scope of the inquiry a trial court may (or must) conduct once it properly undertakes to investigate a suggestion of juror misconduct? Again, the cases are full of general pronouncements entrusting the matter to the trial court's discretion. (E.g., People v. Beeler (1995) 9 Cal.4th 953, 989, 39 Cal.Rptr.2d 607, 891 P.2d 153, citation omitted ["The court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ including whether to conduct a hearing or detailed inquiry"]; People v. Keenan, supra, 46 Cal.3d 478, 539, 250 Cal.Rptr. 550, 758 P.2d 1081 ["broad discretion as to the mode of investigation"]; People v. Delamora (1996) 48 Cal.App.4th 1850, 1856, 56 Cal.Rptr.2d 382 ["Clearly, it is up to the trial court to determine the appropriate procedure to follow when a question arises about a juror's continued service"].) Again, however, the court's discretion is limitedin this instance by a body of ambiguous and sometimes conflicting appellate decisions.
*513 Some cases discussing the question in the abstract have described the contemplated investigation as "summary" in nature. (People v. Manriquez (1976) 59 Cal. App.3d 426, 432, 130 Cal.Rptr. 585; People v. Tinnin, supra, 136 Cal.App. 301, 318-319, 28 P.2d 951.) This wording, however, contemplates an absence of testimonial formalitiesnot a cursory or perfunctory investigation. (See People v. Burgener, supra, 41 Cal.3d 505, 519, 224 Cal.Rptr. 112, 714 P.2d 1251 ["a complete, though summary, hearing"].) Thus "it is not necessary to take testimony in the manner required judicially to establish a controverted proposition." (People v. Tinnin, supra, 136 Cal.App. 301, 318-319, 28 P.2d 951; see People v. McNeal, supra, 90 Cal. App.3d 830, 837, 153 Cal.Rptr. 706 [court not required to take sworn testimony].)
More substantively, it is clear that any investigation into juror misconduct "should be complete enough to determine `good cause.'" (People v. McNeal (1979) 90 Cal.App.3d 830, 837, 153 Cal.Rptr. 706; see People v. Keenan, supra, 46 Cal.3d 478, 532, 250 Cal.Rptr. 550, 758 P.2d 1081; People v. Burgener, supra, 41 Cal.3d 505, 519-520, 224 Cal.Rptr. 112, 714 P.2d 1251.) Indeed, failure to conduct an inquiry sufficient to the occasion is an abuse of discretion. (People v. Keenan, supra, 46 Cal.3d 478, 532, 250 Cal.Rptr. 550, 758 P.2d 1081; People v. Burgener, supra, 41 Cal.3d 505, 519-520, 224 Cal.Rptr. 112, 714 P.2d 1251.) Thus, in People v. Castorena, supra, 47 Cal.App.4th 1051, 1064, 55 Cal.Rptr.2d 151, the trial court abused its discretion by discharging a holdout juror, without conducting further investigation, after seven or eight jurors reported that the holdout was failing to deliberate, but the holdout submitted her own lengthy written account of the deliberations. (See also People v. McNeal, supra, 90 Cal.App.3d 830, 839, 153 Cal.Rptr. 706 [trial court conducted inadequate investigation into indications that a juror had personal knowledge bearing on the matters in issue; "Once a court is put on notice of the possibility that improper or external influences are being brought to bear on a juror, it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and whether the impartiality of other jurors has been affected"].)
Of course, defendant does not contend that the court below failed to adequately investigate the conduct and statements of Juror No. 8. He contends that the court went too far, exceeding the scope of permissible inquiry and intruding on the deliberative process of the jury. To address this contention in proper context, however, we must recognize that current law requires the trial court to steer a hazardous and poorly marked course between the opposing perils of inadequate inquiry on the one hand and excessive inquiry on the other. Our function cannot end at approving or disapproving the course actually followed by a trial court in a particular case. We are duty-bound to chart, as best we can, the channel between the shoals.

E. Excessiveness of Investigation.

As noted above, a trial court commits prejudicial error if it fails to conduct an adequate inquiry into suggestions of jury misconduct. Manifestly, a trial court may also err by probing too deeply into the deliberations of the jury. Indeed, a line of federal cases cited by defendant would effectively bar the trial court from conducting any inquiry which discloses the contents of jury deliberations. (United States v. Brown (D.C.Cir.1987) 823 F.2d 591, 596-597; United States v. Thomas (2d Cir. 1997) 116 F.3d 606, 618-624; United States v. Symington (9th Cir.1999) 195 F.3d 1080.) As we understand these cases, they permit removal of a juror during deliberations only if the cause for removal indisputably appears without disclosing anything said in deliberations. If misconduct is less readily apparent, the court can only wait to see whether the situation resolves itself. If it does not, and the jury hangs, the court can only declare *514 a mistrialeven though the impasse may in fact be the direct result of a juror's refusal or inability to perform his or her duties.
In Brown, supra, 823 F.2d 591, after weeks of deliberations, a juror submitted a note stating that he was unable to perform his duties. Questioned by the trial court, the juror expressed disagreement with the statute under which the defendants were being prosecuted, but also stated that he had difficulties with "the way the evidence has been presented" and its failure to conform to the "fashion in which the law is written." (Id. at p. 594.) The trial court concluded that although the reasons for the juror's request were unclear, further questioning "would intrude on the secrecy of the jury's deliberations." (Id. at p. 595.) The court discharged the juror on the ground that he would not follow the law. (Ibid.) The remaining jurors returned convictions several weeks later.[17] (Ibid.)
On appeal, the circuit court first held that a trial court "may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence." (Id. at p. 596.) Next, the court observed that "the reasons underlying a request for a dismissal will often be unclear." (Ibid) However, the court wrote, the trial judge "may not delve deeply into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations." (Ibid.) Accordingly, "unless the initial request for dismissal is transparent, the court will likely prove unable to establish conclusively the reasons underlying it." (Ibid.) Therefore, the court concluded, "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." (Ibid.; italics added.) Since the record disclosed a "substantial possibility" that the juror in question "requested to be discharged because he believed that the evidence offered at trial was inadequate to support a conviction," the judgment of conviction was reversed. (Ibid.)
In Thomas, supra, 116 F.3d 606, a juror's removal was instigated not by his own request, but by complaints from other jurors about his disruptive behavior and allegedly unyielding refusal to consider the majority point of view. The trial court excused the juror, finding that the juror's "`motives are immoral, that he believes that [the defendants] have a right to deal drugs, because they don't have any money.... And I don't think he would convict them no matter what the evidence was.'" The trial court further found that the juror "was refusing to convict `because of preconceived, fixed, cultural, economic, [or] social ... reasons that are totally improper and impermissible.'" (Id. at p. 612.)
*515 Citing Brown, the circuit court reversed. The court acknowledged that refusal to apply the governing law, also known as "nullification," constitutes proper grounds to discharge a juror. (Id. at p. 608.) However, the court declared, a juror may be removed "only where the record is clear beyond doubt that the juror is not, in fact, simply unpersuaded by the prosecution's case." (Ibid., italics added.) The trial court erred in dismissing the juror there "based largely on its finding that the juror was purposefully disregarding the court's instructions on the law, where the record evidence raised the possibility that the juror's view on the merits of the case was motivated by doubts about the defendants' guilt, rather than by an intent to nullify the law." (Id. at pp. 608-609, italics added.)
In Symington, supra, 195 F.3d 1080, the Ninth Circuit followed Brown and Thomas, with a slight modification: instead of prohibiting discharge where there is "any possibility" that the removal is motivated by doubts about the sufficiency of the evidence of guilt, the court limited the prohibition to situations where there is a "reasonable possibility" that this condition is present. (195 F.3d at p. 1087, fn. 5.) A divided panel held that the record there raised such a possibility; thus it was error to discharge the questioned juror. (Id at p. 1088.)
The reasoning of these cases begins with the inarguable proposition that a juror cannot be removed merely because he or she disagrees with other jurors about the sufficiency of the case against the accused. Removal of such a juror without good cause impermissibly "load[s] the jury" in favor of one of the parties. (People v. Hamilton (1963) 60 Cal.2d 105, 128, 32 Cal.Rptr. 4, 383 P.2d 412, disapproved on other grounds in People v. Daniels, supra, 52 Cal.3d 815, 864-865, 277 Cal.Rptr. 122, 802 P.2d 906.) Entertaining a doubt about the sufficiency of the prosecution's case (as distinct from an immutable, categorical hostility to the basic premise of the case) is not good cause for removal. Therefore, a trial court commits grievous error if it discharges a juror "because" that juror entertains such a doubt.
Beyond this point, however, we find the reasoning of the Brown line of cases somewhat obscure and ultimately unpersuasive. They seem to hold that whenever the record raises a "possibility" that a proposal to remove a juror "stems from" doubts about the sufficiency of the prosecution's case, the trial court is powerless to grant the proposal because the removal might then offend the defendant's right to a unanimous jury. We find this proposition critically ambiguous with respect to the exact nature of the condition which renders the trial court powerless to actin particular, what is meant by the requirement that the removal "stem from" doubts about the defendant's guilt. The phrase could refer to (1) the motives of the person or persons requesting removal, (2) the source or cause of the juror's own alleged misconduct, or (3) the trial court's reasons for discharging the juror. None of these factors justifies the presumptive rule suggested by these cases.
Insofar as the rule of these cases alludes to the grounds on which a trial court acts in discharging a juror, their rationale appears contrary to one of the most familiar rules of California appellate procedure, i.e., that the decision of the trial court is presumed to be correct. The existence of error "is never presumed, but must be affirmatively shown.... [A]ll presumptions and intendments are in favor of the regularity of the action of the lower court in the absence of a record to the contrary." (People v. Green (1979) 95 Cal. App.3d 991, 1001, 157 Cal.Rptr. 520, quoting People v. Clifton (1969) 270 Cal.App.2d 860, 862, 76 Cal.Rptr. 193, internal quotation marks omitted; In re Raymundo B. (1988) 203 Cal.App.3d 1447, 1452, 250 Cal. Rptr. 812; see People v. White Eagle (1996) 48 Cal.App.4th 1511, 1523, 56 Cal. Rptr.2d 749, quoting People v. Garcia (1987) 195 Cal.App.3d 191, 198, 240 Cal. *516 Rptr. 703 ["We must indulge in every presumption to uphold a judgment, and it is defendant's burden on appeal to affirmatively demonstrate errorit will not be presumed"]; People v. Nitschmann (1995) 35 Cal.App.4th 677, 684, 41 Cal.Rptr.2d 325 ["Error is never presumed and appellant has the burden to show error"].) This rule requires us to conclude, in the absence of an affirmative showing to the contrary, that the trial court did the right thing for the right reasons. In the present context this means that if the record discloses multiple grounds for removing a juror, some permissible and some impermissible, the trial court must be presumed to have acted upon a permissible ground, and not an impermissible one, unless the record shows otherwise.
The holdings in Brown and its progeny appear to rest, at least in part, on an approach directly contrary to these familiar principles. They indulge an assumption that if the removal of a juror might have been motivated by an improper concern, it must be treated as having in fact been so motivated. In the absence of binding authority to that effect, we cannot adopt such an approach.[18] Instead we must presume that where the record fails to establish otherwise, the trial court acted for proper reasons.
Alternatively, much of the language in Brown et al. suggests a concern less with the trial court's reasons for excusing or discharging a juror than with the jurors' motive for seeking such excusal or discharge. (See Brown, supra, 823 F.2d at p. 596 ["if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request"]; id. at p. 597 ["Given the possibility ... that Spriggs' desire to quit deliberations stemmed from his belief that the evidence was inadequate to support a conviction, we must find that his dismissal violated the appellants' right to a unanimous jury verdict" (italics added)]; Thomas, supra, 116 F.3d at p. 622 ["`if the record evidence discloses any possibility that' a complaint about a juror's conduct 'stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request'"]; ibid., fn. 11, italics omitted ["if the record raises any possibility that the juror's views on the merits ... underlay the request that he be discharged, the juror must not be dismissed"]; Symington, supra, 195 F.3d at p. 1085 ["It is undisputed that ... if the other jurors did seek to remove Cotey because they disagreed with her views on the merits ... then dismissal of Cotey was improper"]; id. at p. 1088, fn. 7 [noting "reasonable possibility that Cotey's views on the merits provided the impetus for her removal"; issue of "underlying motive for the attempt to have Cotey dismissed"], id. at p. 1088, fn. 8 ["it was only because of their disagreement with Cotey on the merits *517 that the other jurors had occasion to question her ability to deliberate"]; id. at p. 1088, fn. 9 ["the problems all stemmed from the other jurors' disagreement with her position on the merits"].) (Italics added throughout.)
This approach seems to us even farther removed from any recognized principle of law. The function of an appellate court is to review the actions of the trial courtthe rulings made, the orders granted or denied. When a juror asks to be excused, or asks that another juror be excused, it is for the trial court to determine whether legal cause for such removal is present. If the record shows no basis for removal apart from disagreement over the merits of the case, then there is no good cause to remove the juror, and it is error to do so. However, if the record shows that the questioned juror is unable or unwilling to perform his or her duties, and the trial court excuses or discharges the juror on that basis, we know of no principle of law which would support the invalidation of that ruling based solely on the fact that the removed juror, or other jurors, were also frustrated over disagreements on the merits. To be sure, a nondeliberating or otherwise misbehaving juror may tend to polarize other jurors into opposition, and in handling a substitution in such circumstances the court must be sensitive to such risks. But except as circumstances to which the court must be alert, the motives behind the original request for removal appear legally irrelevant.
This is not to dismiss entirely the concern motivating the federal decisions. Where an intimidated holdout juror asks to be excused, or frustrated majority jurors seek the holdout's removal, the trial court must be extremely careful not to subordinate its own adjudicatory function to the jurors' desires. The power to control the composition of the jury is reserved exclusively to the trial court. (People v. Roberts (1992) 2 Cal.4th 271, 325, 6 Cal. Rptr.2d 276, 826 P.2d 274.) The feelings of jurors, if not disabling, furnish no more cause for removal than the court's own concern over a possible hung jury and mistrial. If the jury hangs because one juror entertains persistent doubts despite deliberating without categorical preconceptions, then a hung jury and mistrial must and should result. Moreover, a trial judge investigating claims of juror misconduct should be alert to the possibility that the frustration of jurors over legitimate disagreements may color their descriptions of deliberations, and the court should consider that factor in weighing conflicting accounts.
A trial court investigating alleged jury misconduct must also be extremely careful not to convey an impression to any of the jurorsmajority or minorityconcerning the legitimacy of their respective positions. Most obviously, the court cannot permit the proceedings to convey the slightest implication to the jurors that holdouts must or should capitulate to the majority view, that a holdout was removed for failing to do so, or that a substitute juror is not free to reach and hold a position contrary to that of the majority. The court may and perhaps should admonish jurors not to allow renewed deliberations to be colored either by the court's actions in the matter or by any strong emotions aroused by the events which produced the investigation.[19]
However, if the trial court adequately addresses these hazards, we cannot agree with the federal decisions that it is barred from removing a juror merely because the record raises a possibility that doubts by the questioned juror were a causative factor in the juror's removal. *518 Rather, if the court finds that a juror is unable or unwilling to perform his or her duties, the court may and must remove that juror whether or not the juror also entertains doubts about the sufficiency of the prosecution's proof. Provided it performs its functions with circumspection and care, so as to avoid any improper influence on the deliberative process, the court commits no error by removing a juror whose doubts, like those of Juror No. 8 here, rest upon fixed categorical preconceptions which prevent him from weighing and deliberating over the evidence or following the court's instructions.
Nor can we agree with the federal cases that a judge faced with allegations of jury misconduct in deliberations is barred from inquiring into events and statements in the deliberation room. Under California authority, the trial court may and must conduct an inquiry into jury deliberations sufficient to resolve claims of misconduct or other cause for removal. The dramatic restrictions imposed by the federal cases on that investigative power are inconsistent with California caselaw permitting inquiry into jury deliberations when it is reasonably calculated to ascertain the truth of suggestions that a juror has prejudged the case, is unable or unwilling to deliberate, or otherwise lacks the capability to fulfill his or her duties. (E.g., People v. Feagin, supra, 34 Cal.App.4th 1427, 1435-1437, 40 Cal.Rptr.2d 918 [court examined all twelve jurors, eight over counsel's objection, concerning statements and conduct of holdout juror]; People v. Thomas, supra, 218 Cal.App.3d 1477, 1485, 267 Cal.Rptr. 865 [court questioned all jurors concerning reported statements in deliberations before excusing juror for categorical bias against police witnesses; "no amount of questioning was likely to lead to an outright admission of bias, and the court properly relied upon the testimony of the other jurors in determining the issue"]; People v. Bradford, supra, 15 Cal.4th 1229, 1349-1352, 65 Cal.Rptr.2d 145, 939 P.2d 259 [court inquired into jurors'"emphatic" statements reportedly betraying prejudice against defendant]; People v. Williams, supra, 46 Cal.App.4th 1767, 1780-1781, 54 Cal.Rptr.2d 521 ["several jurors testified that juror No. 373 was inattentive, constantly requested that the jurors take time to organize their notes, forgot previous votes or discussions"]; People v. Thomas, supra, 26 Cal.App.4th 1328, 1333, 32 Cal. Rptr.2d 177 [holdout juror was properly discharged on evidence, apparently from juror interviews, that "he was not forthcoming with answers to jurors' discussion questions and did not cooperate with the other jurors"].) The notion that jury deliberations are cloaked in an absolute privilege against disclosure is incompatible with the treatment of the issue in these cases and is not borne out by any binding authority known to us.
Indeed, as previously noted, California courts hold it an abuse of discretion not to conduct an inquiry sufficient to resolve assertions of juror misconduct, even where any further investigation would entail questioning jurors about the course of deliberations. Thus in People v. Castorena, supra, 47 Cal.App.4th 1051, 55 Cal. Rptr.2d 151, the court discharged juror Patricia S., after questioning her and eight other jurors, for failure to deliberate. The court of appeal held this an abuse of discretion. The questioned juror had submitted her own lengthy written account of deliberations, in essence rebutting the allegations against her, and the trial court should have conducted further inquiry into the resulting factual conflict: "Absent such inquiry, the court did not have the requisite facts upon which to decide whether Patricia S. in fact failed to carry out her duty as a juror to deliberate or whether the jury's inability to reach a verdict was due, instead, simply to Patricia S.'s legitimate disagreement with the other jurors." (Id. at p. 1066, 55 Cal.Rptr.2d 151.)
The notion that jury deliberations are absolutely off-limits to investigation for jury misconduct is also incompatible with the analysis in People v. Collins, supra, 17 *519 Cal.3d 687, 131 Cal.Rptr. 782, 552 P.2d 742. The trial court there excused a juror after "questioning] [her] extensively," based on her professed inability to deliberate. (Id, at p. 696, 131 Cal.Rptr. 782, 552 P.2d 742.) On appeal the defendant argued that her claims of emotional distress did not furnish sufficient grounds for removal because "inquiry into the possible existence of good cause for dismissal of a juror after deliberations have begun must be designed to elicit a factual basis to support such good cause having an existence independent of the deliberative process of the jury." (Id, at pp. 695-696, 131 Cal.Rptr. 782, 552 P.2d 742, italics added.) The Supreme Court rejected this contention, holding that the trial court permissibly found the juror unable to perform her duties, whether or not that inability flowed from an emotional reaction to the evidence.
Indeed in Perez v. Marshall, supra, 119 F.3d 1422, the Ninth Circuit recently approved an extensive inquiry into jury deliberations. A defendant convicted in a California court sought federal habeas relief on the ground that the trial court had excused a juror who reported that she entertained reasonable doubts about the defendant's guilt but was unable to continue with deliberations. The trial court had described the juror as "an emotional wreck" after questioning her and the foreperson about "what had transpired in the jury room." (Id, at p. 1425.) The Ninth Circuit found no constitutional violation either in finding cause to discharge the juror, or in "excusing [the juror] when it knew that [she] was the lone juror holding out for an acquittal." (Id. at p. 1426.) The court quoted with approval the district court's observation that "`[n]othing in the record indicates that the trial court's discretion was clouded by the desire to have an unanimous guilty verdict.'" (Id, at p. 1427.) "In fact," the Ninth Circuit continued, "the record shows that the district [sic; superior] court was forced to act, not because of Robles's status as a holdout juror, but because of Robles's emotional inability to continue performing the essential function of a jurordeliberation." (Ibid.)
We conclude that the rule of Brown and its progeny, practically precluding removal of a juror who refuses to deliberate due to a categorical bias or opposition to the substantive law, is neither persuasive in its own light nor compatible with existing California authority. We adhere instead to the principle that the nature and scope of an inquiry into suggested jury misconduct in deliberations is entrusted to the trial court's sound discretion, bounded by the principles we have already noted. Thus, excusing a juror without adequately establishing the presence of good cause is an abuse of discretion, and discharging a juror merely to avoid a deadlock and resulting mistrial is both an abuse of discretion and a violation of the defendant's right to a unanimous jury. In addition, all proceedings must be conducted so as to avoid "tainting" further deliberations by implicitly endorsing the position of either majority or minority jurors. If the court adheres to these guidelines, however, it may conduct a reasonable inquiry into any claim of misconduct, even if the inquiry involves disclosure of statements made in the deliberation room; and if the court finds that a juror is unwilling or unable to perform his or her function, it may remove that juror and appoint a substitute, even if it also appears that the discharged juror was unconvinced of the defendant's guilt.
As the court in United States v. Thomas, supra, 116 F.3d 606, 620, correctly pointed out, there are cases where an inquiry into possible grounds for juror removal can be quite limited, raising little or no concern about impinging on the jurors' deliberative processes. This is most likely where a juror becomes incapacitated due to drinking, illness, a death in the family, or other similar cause. The difficult inquiries will of necessity be those where the allegation is one of "failure to deliberate" *520 or "failure to follow the law." In these cases, the trial court indeed walks a difficult course in conducting a sufficient inquiry under appropriate California authority, without improperly delving into the deliberative process. We are not holding that a court can conduct an unlimited inquiry in order to determine if good cause exists to dismiss a juror accused of misconduct. At some point, an inquiry may become so intrusive into the thought processes of the jurors that the defendant's Sixth Amendment right to a fair trial is implicated. We do not agree, however, with Brown and the cases following it, which draw this line, in our opinion, far too short by indicating that once a possibility (or reasonable possibility) arises that the juror in question may have difficulty with the sufficiency of the evidence, no matter what else has or has not been revealed, all inquiry must cease.
Here the evidence amply supported the trial court's findings that Juror No. 8 was laboring under a severe bias, was unwilling or unable to deliberate in an impartial manner, and was inattentive to the proceedings. While the evidence also established that he entertained doubts about the prosecution's case, the court found on substantial evidence that the doubts were not actuated by a perceived insufficiency of the evidence but by a previously undisclosed categorical preconception about the range of possible human behaviors. In any event, the juror's doubts did not preclude his discharge in light of the independent, entirely appropriate grounds for removing him. Accordingly we find no error in the court's removal of Juror No. 8 and substitution in his place of an alternative juror.

II.

Stay of Arson Sentence.[**]
The judgment is affirmed as modified by the trial court's order of December 8, 1998.
REARDON, J., concurs.
POCHÉ, Acting P.J.
I respectfully dissent.
In the case before us on the third day of deliberations the first note sent to the court asked if using "general feelings" about the bond between a mother and son rather than following instructions constituted bias which a juror should set aside. To that inquiry the court quite properly instructed the jury in its obligation to limit its consideration to the evidence presented. (Maj. opn., ante, at p. 502.)
That afternoon, however, a much lengthier note stated that a juror or jurors were still discussing "feelings" or "suppositions" rather than evidence and discussing "unreasonable interpretations of the evidence." The note went on to suggest that for a variety of reasons including "an internal belief system" a juror(s) was biased against finding "that an individual may be capable of committing the charged crime." Accordingly, it announced "we are at an impasse." (Maj. opn., ante, at p. 502, fn. 2.)
This second note, quite unequivocally states that the jury was deadlocked. The trial court, however, rejected that view despite defense counsel's objection. This would have been a point at which the court could have elected to inquire of the jury as to the numerical division of its votes and whether there was a reasonable probability that additional deliberation would result in a unanimous verdict. (Pen.Code, § 1140; People v. Price (1991) 1 Cal.4th 324, 467, 3 Cal.Rptr.2d 106, 821 P.2d 610.)
The questioning of the presiding juror in this case revealed that there was a holdout juror who was participating in deliberations but expressed doubts, especially on the question of motive. (Maj. opn., ante, at p. 503.) In my view the responses of the presiding juror establish beyond question that the holdout had doubts about the sufficiency of the evidence to convict defendant. *521 Once that became clear it was inappropriate to inquire further.
In sum, once the court's inquiry disclosed a reasonable probability that complaints about the conduct of the holdout juror arose because of that juror's view of the sufficiency of the evidence of defendant's guilt, the request to dismiss the holdout had to be denied. (U.S. v. Symington (9th Cir.1999) 195 F.3d 1080.) When this court failed to do so it deprived defendant of his Sixth Amendment right to a unanimous verdict by an impartial jury.
Applying this absolute rule is not simply a question of expedience. It is both constitutionally mandated and in my view highly practical. When a court ignores a dispute over the sufficiency of the evidence and continues questioning the jurorsor as this court did permitting questioning by counselit risks abdicating its role as a neutral arbiter by seeming to validate the majority jurors' assessment of the evidence and/or the law. And as the questioning goes beyond legitimate inquiry into specific acts constituting the alleged misconduct the answers oh so easily reveal those thought processes which are the essence of deliberation.
Moreover the answers to such questions are rarely worth the risks. The very language used by the presiding juror in this case to describe the holdout is revealing. She characterized him as unable "to separate feelings, sentiment and bias" from his evaluation of the evidence and unwilling to "assign facts to his reasons" or "he doesn't at times make sense, we don't feel he's reasonable." (Maj. opn., ante, at p. 503.) I suspect most of us in the aftermath of a heated argument have similarly labeled an opponent as irrational, illogical and unable to distinguish fact from sentiment. Rationality is often in the eye of the beholder, but most frequently we see it in those who agree with us.
I would reverse the judgment.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.
[1] A number of cases raising related issues, including one from this division, are currently pending before the California Supreme Court. (People v. Rodriguez (1998) 65 Cal.App.4th 1156, 77 Cal.Rptr.2d 279, review granted Nov. 18, 1998 (S073219), cause ordered held pending disposition in Metters, infra, and People v. Martinez (1999) 20 Cal.4th 225, 83 Cal.Rptr.2d 533, 973 P.2d 512 [concerning asportation element in offense of kidnapping a minor]; People v. Metters (1998) 61 Cal. App.4th 1489, 72 Cal.Rptr.2d 294, review granted June 10, 1998 (S069442) and issues limited to whether dismissal of holdout juror violated appellant's right to unanimous jury; People v. Cleveland (March 24, 1999) B121361, review granted June 30, 1999 (S078537); People v. Williams (Oct. 20, 1997) H015048, review granted Feb. 18, 1998 (S066106) and issues limited to whether trial court violates defendant's sixth amendment rights by dismissing deliberating juror whom court believes is engaged in jury nullification; People v. Valley (March 16, 1999) A079282, review granted June 16, 1999 and cause ordered held pending disposition in Williams (S078176); People v. Baca (March 30, 1999) B120137, review granted July 14, 1999 (S078755) and cause ordered held pending disposition in Metters and Cleveland.)
[2] The note stated: "We are concerned a juror(s) are not capable of following the instructions of the court, in regards to lines of evidence. [¶] This juror/jurors are NOT discussing evidence as presented in this court, but are discussing `feelings.' [¶] This juror/jurors are discussing suppositions not in evidence (others are framing the defendant). [¶] This juror/jurors are discussing unreasonable interpretations of the evidence. We have NOT been accorded lines of evidence which support the alternative interpretation. [¶] Further: [¶] These individuals are seriously concerned that his/her job has been lost due to the trial (multiple statements). [¶] These individuals have stated that marital problems may be occurring due to the trial. [¶] These individuals have stated that they have been l[o]sing significant sleep at night over concerns for voting correctly. [¶] We are concerned that this/these individuals may be acting under duress, and [¶] We are concerned that, as Mr. Berger said, `There is a trial for every juror and a juror for every trial.' We are sincerely concerned that this trial is NOT for this, or these, jurors, [f] We are likely facing an internal belief system, [whether] personal or cultural, which is precluding that an individual may be capable of committing the charged crime. [¶] As a result ... we are at an impasse." (Underlining and ellipsis in original.)
[3] As occurred more than once, Juror 8 actually gave contradictory answers to some of the crucial questions, and his responses were rendered all the more ambiguous by the compound or convoluted wording of some of the questions. The relevant exchange here is transcribed as follows:

"Mr. Berger: Q First, I want to make sure the answer to one of the judge's first questions wasis this what you said? Did you say you find it hard to believe that a loving son can kill his mother like that under normal conditions?
"A Yes.
"Q And when you say `like that,' you are referring to the number of stabs?
"A Yes.
"Q And you heard very, very early in the trial when the judge told everybody that Mr. Hightower is accused of killing his mother. He said that early on.
"A Yes.
"Q You heard that. And at that point you didn't think that you could not be a fair juror in this case, did you?
"A Yes.
"Q You thought that it would be okay for you to serve, you would not be biased?
"A Yes.
"Q And also I want to make sure I understand. You say you think that you're being fair back there although some of the other jurors think that perhaps you're not.
"A Yes.
"Q If you made a statement like the one the judge asked you about or Mr. Golde asked you about, you may or may not have said something to that effect, but it was basically in the course of defending yourself against a lot of pressure from the other jurors?
"A Yes."
[4] "Q [By the Court] If you were sitting on a case where a stranger killed another stranger would you have any trouble bringing in a verdict of guilty if the District Attorney proved the case beyond a reasonable doubt?

"A Yes.
"Q Would you have any trouble bringing in a verdict of guilty if the District Attorney proved the case beyond a reasonable doubt?
"A Yes.
"Q You would have trouble?
"A Yeah.
"Q Do you have any feeling . .. I'm not certain whether you understand it . .., you Would have trouble bringing in a verdict of guilty even if the District Attorney proved that a stranger killed another stranger?
"A Yes.
"Q You would have trouble doing that?
"A No.
"Q You wouldn't. Okay. In a case such as we have before us today, where the charge is that the defendant murdered his mother, would you require more from the District Attorney than proof beyond a reasonable doubt to bring in a verdict of guilty?
"A Yes.
"Q [By Defense Counsel] ... [I]f you're on a jury in any case where a son is accused of killing his mother, not necessarily this case, it could be not stabbing, it could be shooting, it could be poison, it could be one stab wound, it could be anything, if you're on that jury, any case where the son is accused of killing his mother, would the District Attorney ever be able to prove his case to you or would it be impossible?
"A Yes.
"Q So you can imagine a case where the son is charged with killing his mother where the son would be guilty and you would vote guilty?
"A Yes.
"Q Would Mr. Golde, would the District Attorney have to prove his case more than beyond a reasonable doubt or would he just have to do whatever he has to do in this case, prove it beyond a reasonable doubt?
"A Yes."
[5] Although no formal request for judicial notice has been made, we assume the last-quoted comment refers to the current television series "The X-Files," which chronicles fictional investigations of extraterrestrial visitations and paranormal phenomena.
[6] The court stated its ruling as follows: "I find from the inquiry conducted in chambers, and after having taken into account the statements of counsel by way of argument, that Juror No. 8 is guilty of misconduct in several respects.

"It's a fair inference from the fact that the nature of the charge, Count 1, was mentioned by the court, by both counsel on numerous occasions during the course of the voir dire examination, that Juror No. 8 was fully aware of the fact that this case included a charge of murder and that the defendant is accused of having murdered his mother and at that time Juror No. 8 had a belief that prevented him from being a fair juror in such a case.
"I also find that Juror No. 8 failed to deliberate. Now it's true that he participated in some respects, but failure to deliberate can occur in a number of different ways other than just simply withdrawing from the deliberations. Engaging in supposed deliberations that deal with exorcism and aliens is, in my opinion, a refusal to deliberate to that extent. I find that to be true, too.
"The evidence is overwhelming that Juror No. 8 didn't hear all of the evidence. None of the jurors questioned stated thatthere was no question but that he was asleep, all expressed an opinion that he was asleep, and the last juror, if I remember correctly, said that whenon the last occasion that Juror No. 8 was asleep during readback of testimony when the jurors returned to the jury deliberation room Juror No. 8 could not even recall what the readback was, and the inference is compelling that he was asleep and the fact that he missed part of the testimony, he missed other parts of the testimony. If a juror misses parts of the testimony because they are asleep that is inattentiveness and that's misconduct.
"I think too that it satisfactorily appears that Juror No. 8 responded falsely to a question asked on the voir dire examination as to his ability to be fair in a charge of murder when the accused is the son of the victim. I think Juror No. 8's predisposition that no son can ever murder his mother and of course that's simply not true.
"The addition of loving to the argument I don't think makes much difference because it's certainly true that a loving son or loving mother cana loving son may murder the mother and a loving mother may murder a child. The cases are many in which such event has occurred.
"Having made these findings I conclude that Juror No. 8 is guilty of juror misconduct, cannot be a fair juror and should be and is excused."
[7] "I have found from the evidence that [Juror 8] has deep[-]rooted feelings that prevented him from fairly hearing a case of matricide. [Juror No. 8] disclosed his bias in the jury room by statements heard by all but one juror. From the admission, in the jury room, that [Juror No. 8] would not have become a juror if he had known the case charged murder of defendant's mother, I conclude that [Juror No. 8] gave false answers to the questions asked on jury voir dire. On many occasions before and during the voir dire examination the court and each counsel reminded the jury that the charge was murder of defendant's own mother. The jury, including [Juror No. 8], was asked whether there was . . . anything whatever about the case that would cause the juror to suspect his ability to be a fair juror.

"The District Attorney inquired of the jurors preceding [Juror No. 8] whether the jurors could bring in a verdict of guilty if there was not an eyewitness but only circumstantial evidence alone. [Juror No. 8] did not make known his reservations about conviction in a case proved by circumstantial evidence. While there may be some question about [Juror No. 8's] command of the English language there is nothing to suggest that [Juror No. 8] suffered from a hearing deficit. It is a virtual impossibility that [Juror No. 8] did not hear at least one of the many references to the nature of the case as being one charging matricide. His failure to disclose his suspicion about ability to be a fair juror was intentional. I am persuaded that before and at the time of the voir dire examination, [Juror No. 8] held a deep[-]seated belief or feeling that a son could never murder his mother; that he knew that this was his bias at the time he answered the question on the voir dire; that he understood the questions on the voir dire examination on the subject of a son murdering his mother and that he wilfully failed to disclose his bias in this respect. I find that by reason of this undisclosed bias [Juror No. 8] had pre-judged the issue, [citations]; refused to follow the instructions on the law; refused to deliberate in the sense that what purported to be deliberation was avoidance of deliberation by interjecting absurdities e.g. exorcism and x-files forces; that in falling asleep during the trial he was inattentive. [Citation.] I believe that nothing short of an eyewitness to the killing would get [Juror No. 8] past his bias, and given his comments concerning influencing forces such as exorcism and x-file forces it is possible that even a credible eye witness would not have been sufficient to get [Juror No. 8] past his bias.
"... [Juror No. 8] should have disclosed his sleep deprivation problem as a physical condition that might affect his ability to fairly hear the case, and his ability if he found that he had missed some part of the proceedings to request readback of testimony.
"The evidence offered by the eleven jurors other than [Juror No. 8] amply demonstrated that [Juror No. 8] could not follow the instructions and apply the law in a case in which the defendant was charged with murder of his mother; that [Juror No. 8] knew of this bias at the time he answered questions on the voir dire examination and withheld disclosure thereof; that in falling asleep [Juror No. 8] demonstrated either his prejudgment of the issues, or his inability to give his attention to the evidence, or both. That his assignment of reasons for his position such things [as] x-files forces or exorcism as the cause of death, or that someone was trying to frame defendant when the record is barren of any evidence to support such interpretation had the same effect as an outright refusal to deliberate the case and the evidence received in the trial and was therefore a refusal to deliberate.
"[Juror No. 8's] inability to serve as a juror ... was proven, in my opinion', to be a clearly demonstrated reality. Good cause for discharge was proven and he was therefore excused for cause."
[8] Penal Code section 1089 states in part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors."

Code of Civil Procedure section 233 provides: "If, before the jury has returned its verdict to the court, a juror becomes sick or, upon other good cause shown to the court, is found to be unable to perform his or her duty, the court may order the juror to be discharged. If any alternate jurors have been selected as provided by law, one of them shall then be designated by the court to take the place of the juror so discharged. If after all alternate jurors have been made regular jurors or if there is no alternate juror, a juror becomes sick or otherwise unable to perform the juror's duty and has been discharged by the court as provided in this section, the jury shall be discharged and a new jury then or afterwards impaneled, and the cause may again be tried. Alternatively, with the consent of all parties, the trial may proceed with only the remaining jurors, or another juror may be sworn and the trial begin anew."
The latter statute is part of the Trial Jury Selection and Management Act (Code Civ. Proc., § 190 et. seq.), and as such "applies to the selection of jurors, and the formation of trial juries, for both civil and criminal cases, in all trial courts of the state." (Code Civ. Proc.,§ 192.)
[9] In re Hitchings (1993) 6 Cal.4th 97, 111, 24 Cal.Rptr.2d 74, 860 P.2d 466 ("A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct"); People v. Johnson (1993) 6 Cal.4th 1, 22, 23 Cal.Rptr.2d 593, 859 P.2d 673 (untruthful or incomplete responses in jury questionnaire concerning prior convictions supported discharge); People v. Green (1995) 31 Cal.App.4th 1001, 1012, 38 Cal. Rptr.2d 401 (juror properly excused where she falsely denied statements suggesting contact with defendant's family; denials prevented ascertainment of extent of contacts, but court "was entitled to infer from [her] untruthfulness that [she] had in fact lost her impartiality and, hence, was unable to perform her duty as a juror."); People v. Diaz (1984) 152 Cal.App.3d 926, 936, 200 Cal.Rptr. 77 (error not to discharge juror who concealed during voir dire that she had been victim of crime of same general type charged); compare People v. McPeters (1992) 2 Cal.4th 1148, 1175, 9 Cal.Rptr.2d 834, 832 P.2d 146 (distinguishing effect of intentional and unintentional concealment as evidence of bias); People v. Green, supra, 31 Cal.App.4th 1001, 1021-1022, 38 Cal.Rptr.2d 401 (new trial not compelled by juror's concealment of felony record; although timely disclosure of truth would have required disqualification, trial court seemed to find nondisclosure unintentional and expressly found juror lacked actual bias).
[10] People v. Johnson, supra, 6 Cal.4th 1, 21-22, 23 Cal.Rptr.2d 593, 859 P.2d 673 (no abuse of discretion to discharge juror observed by court, two deputies, and prosecutor "exhibiting various physical indicia of sleep"); People v. Thomas (1994) 26 Cal.App.4th 1328, 1333, 32 Cal.Rptr.2d 177 ("To the extent that Juror Bailey could be viewed as merely not paying attention to his fellow jurors and to the court, inattentiveness is also grounds for dismissal of a juror"); cf. People v. Wilkins (1994) 26 Cal.App.4th 1089, 1096, 31 Cal. Rptr.2d 764 (no "`manifest and unmistakable abuse of discretion'" in failing to grant new trial based on testimony of defendant's aunt that "two jurors `appeared' to sleep during part of defense counsel's final argument"); People v. Bradford (1997) 15 Cal.4th 1229, 1349, 65 Cal.Rptr.2d 145, 939 P.2d 259 (no abuse of discretion to fail to conduct further inquiry where record showed only that juror was observed sleeping on two occasions during lengthy trial); see generally Annot., Inattention of Juror From Sleepiness or Other Cause as Ground for Reversal or New Trial (1998) 59 A.L.R.5th 1.
[11] People v. Keenan (1988) 46 Cal.3d 478, 532, 250 Cal.Rptr. 550, 758 P.2d 1081 ("A sitting juror's actual bias, which would have supported a challenge for cause, renders him `unable to perform his duty' and thus subject to discharge... ."); People v. Thomas (1990) 218 Cal.App.3d 1477, 1484-1485, 267 Cal. Rptr. 865 (court properly discharged juror who categorically refused to credit police officers; "A juror's duty is to weigh the evidence and credibility of witnesses with impartiality and to reach a fair and unbiased verdict."); People v. Feagin (1995) 34 Cal.App.4th 1427, 1437, 40 Cal.Rptr.2d 918 (trial court properly discharged juror who "had prejudged the credibility of the police officers ... and was unable to cast aside her personal bias in weighing the evidence"); People v. Thomas, supra, 26 Cal.App.4th 1328, 1333, 32 Cal. Rptr.2d 177 (trial court found juror had "`made up his mind before he went in there'"); People v. Green (1956) 47 Cal.2d 209, 215-216, 302 P.2d 307 (juror's statement that she did not think she could be fair to prosecution furnished good cause for her removal), disapproved on other grounds in People v. Morse (1964) 60 Cal.2d 631, 637, fn. 2, 648-649, 36 Cal.Rptr. 201, 388 P.2d 33; cf. People v. Bradford, supra, 15 Cal.4th 1229, 1351-1352, 65 Cal.Rptr.2d 145, 939 P.2d 259 (failure to discharge jurors not shown to be error where, despite initial "emphatic" statements, jurors deliberated for 10 days without betraying any inability to perform their functions).
[12] People v. Thomas, supra, 26 Cal.App.4th 1328, 1333, 32 Cal.Rptr.2d 177 (juror "did not answer the questions posed to him by other jurors, did not sit at the table with the other jurors during deliberations, acted as if he had already made up his mind before hearing the whole case, and did not look at the two victims in the courtroom. . . . The refusal to deliberate amounted to a failure of the juror to perform his duty . . . and constituted good cause for removal from the jury"); People v. Feagin, supra, 34 Cal.App.4th 1427, 1436-1437, 40 Cal.Rptr.2d 918 ("A majority of the jurors confirmed that Juror Perdue was unwilling to participate in the jury discussions, refused to explain her thoughts and had brought up issues of police bias...."); People v. Williams (1996) 46 Cal.App.4th 1767, 1780-1781, 54 Cal.Rptr.2d 521 ("several jurors testified that juror No. 373 was inattentive, constantly requested that the jurors take time to organize their notes, forgot previous votes or discussions, and even attempted to alter the jury instructions.... The court found that juror No. 373 was unable to comprehend simple concepts, was unable to remember events during deliberations such as recent discussions or votes, and was not following the law.").
[13] United States v. Thomas (2d Cir.1997) 116 F.3d 606, 608 ("as an obvious violation of a juror's oath and dutya refusal to apply the law as set forth by the court constitutes grounds for dismissal"); see People v. Keenan, supra, 46 Cal.3d 478, 532, 250 Cal.Rptr. 550, 758 P.2d 1081 (juror may be discharged for bias where views on capital punishment would substantially impair performance of duties); People v. Williams, supra, 46 Cal. App.4th 1767, 1780, 54 Cal.Rptr.2d 521 (trial court found juror "was not following the law"); People v. Sanchez (1997) 58 Cal. App.4th 1435, 1446, fn. 2, 69 Cal.Rptr.2d 16, review denied (where jurors asked about power to return legally impossible verdict, court did not err by instructing them that if reluctant to follow law they should notify court and they would be excused: "This is what a trial court is duty bound to do.")
[14] In re Hitchings, supra, 6 Cal.4th 97, 118, 24 Cal.Rptr.2d 74, 860 P.2d 466 (conviction vacated based in part on juror's discussing case prior to submission in violation of instructions and duty under Pen.Code, § 1122); People v. Pierce (1979) 24 Cal.3d 199, 207, 155 Cal.Rptr. 657, 595 P.2d 91 (conviction reversed where juror discussed case with neighbor); People v. Daniels (1991) 52 Cal.3d 815, 863-864, 277 Cal.Rptr. 122, 802 P.2d 906 (juror expressed opinion on guilt prior to deliberations, was overheard discussing case, and read a newspaper article about case during trial; "a court may exercise its discretion to remove a juror for serious and wilful misconduct, such as that shown by Juror Francis's repeated violation of the court's instructions, even if this misconduct is `neutral' as between the parties and does not suggest bias toward either side"); People v. Holloway (1990) 50 Cal.3d 1098, 1106, 1108, 269 Cal. Rptr. 530, 790 P.2d 1327, overruled on another ground in People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588 (juror read newspaper article in violation of instructions); People v. Thomas, supra, 26 Cal.App.4th 1328, 1333, 32 Cal. Rptr.2d 177 (juror took notes home in socks "despite the trial court's warning not to do so").
[15] E.g., People v. Collins (1976) 17 Cal.3d 687, 696, 131 Cal.Rptr. 782, 552 P.2d 742 (juror "stated several times that she could not decide the case on the evidence and the law since she was involved emotionally more than intellectually"); People v. Warren (1986) 176 Cal.App.3d 324, 325-327, 221 Cal.Rptr. 768 (juror said she felt "intimidated" by other jurors, was likely to vote the way they wanted even though she "firmly" believed otherwise, and did not believe she could perform the duty not to be influenced by majority sentiment); People v. Van Houten (1980) 113 Cal. App.3d 280, 285-288, 170 Cal.Rptr. 189 (juror was upset "both physically and emotionally" by evidence concerning grisly murders, to point where she felt she could not "continue as a juror"; she was "`tending to tune out what the witnesses were saying'" and court doubted her ability to deliberate); People v. Fudge (1994) 7 Cal.4th 1075, 1098-1100, 31 Cal.Rptr.2d 321, 875 P.2d 36 (good cause arose for excusing juror on her request when she stated that "anxiety" over job transition would affect her ability to deliberate); People v. Tinnin (1934) 136 Cal.App. 301, 319, 28 P.2d 951 (excusal was "manifestly proper" where, among other things, "the officers in charge of the jury testified that during court adjournments the juror was afflicted on several occasions with severe attacks of hysteria"); Perez v. Marshall (9th Cir.1997) 119 F.3d 1422, 1425, 1428 (juror "appeared to be [an] emotional wreck" and expressed doubts about her willingness and ability to continue; trial court properly excused her and appointed alternate, although excused juror was lone holdout for acquittal); United States v. Ruggiero (2d Cir.1991) 928 F.2d 1289, 1300 (juror "disabled by fear" after receiving what he thought was threat from defendant); United States v. Huntress (5th Cir.1992) 956 F.2d 1309, 1312-13 (juror's mental condition deteriorated due to stress of jury service); United States v. O'Brien (5th Cir.1990) 898 F.2d 983, 985 (juror suffered relapse of depression after one day of deliberations); United States v. Molinares Charris (1st Cir.1987) 822 F.2d 1213, 1222-23 (juror was "nervous and upset," had been crying during deliberations, and had taken tranquilizer).
[16] This assumes, of course, that there are "material, disputed issues of fact" requiring resolution. (People v. Hedgecock (1990) 51 Cal.3d 395, 415, 272 Cal.Rptr. 803, 795 P.2d 1260.) If misconduct is conclusively established by concession, stipulation, or other means, there is no occasion to investigate further. Here defense counsel disputed the sufficiency of Juror No. 1's "allegations" to warrant discharging Juror No. 8, and Juror No. 8's conflicting account confirmed the presence of "disputed issues of fact."
[17] Under the rules in effect prior to December 1, 1999, federal trial courts were required to discharge alternate jurors upon the commencement of deliberations. (Fed. Rules Crim. Proc., rule 24(c), 18 U.S.C. [as amended through Aug. 1, 1987].) The only remedy if the court found it "necessary to excuse a juror for just cause after the jury ha[d] retired to consider its verdict," was to direct that "a valid verdict [might] be returned by the remaining 11 jurors." (Fed Rules Crim. Proc., rule 23(b) [as amended through Aug. 1, 1983].)

California, in contrast, was apparently the first American jurisdiction to provide, in 1895 and 1933, respectively, for the selection of alternates at the outset of trial, and juror replacement after deliberations commenced. (King, Juror Delinquency in Criminal Trials in America, 1796-1996 (1996) 94 Mich.L.Rev. 2673, 2727, 2749.) Prior to 1999, federal courts "resisted such a change, preferring instead to give judges in criminal and civil cases the power to end a case with fewer jurors than the number that began rather than allow them to replace deliberating jurors." (Id. at p. 2749.)
Effective December 1, 1999, the federal rules have been amended to effectively adopt the California approach. (See Fed. Rule Crim. Proc., rule 24(c)(3), as amended Apr. 29, 1999, effective Dec 1, 1999 [empowering court to retain alternates after deliberations commence and to replace regular juror with alternate during deliberations].)
[18] Of course, the decisions of lower federal courts are not binding on us; they have only persuasive force. (People v. Zapien (1993) 4 Cal.4th 929, 989, 17 Cal.Rptr.2d 122, 846 P.2d 704.) Further the logic of a rule which would require a court to retain a juror, where that juror has committed misconduct but may also have difficulty with the sufficiency of the evidence, escapes us. To the extent the Brown line of cases so holds, it would require a trial court to keep on the jury, for example, a juror who blatantly refuses to follow the law (say by insisting on applying a burden on the People of proving the defendant guilty beyond any possible or conceivable doubt, rather than beyond a reasonable doubt) simply because that juror feels the evidence is insufficient to meet his improperly high standard of proof. We must assume the trial court acted properly and dismissed the juror for the proper reason (in this hypothetical, a failure to follow the law), amounting to good cause, and so long as substantial evidence supports that determination, the trial court's decision will be upheld. To hold otherwise would require trial courts to permit known juror misconduct to continue unabated once discovered and/or to declare a mistrial due to the jury's inability to reach a verdict in light of the misconduct. Such unnecessary mistrials impose a great burden on judicial economy (to say nothing of the great cost to taxpayers and monetary and emotional burdens on witnesses, victims, and litigants).
[19] A holdout juror who refuses to deliberate may build up such a level of emotional frustration in majority jurors that some will find it difficult to recommence deliberations with the objectivity the law requires. They should nonetheless be admonished to do so, and not to hold against any party the perceived intransigence of the holdout.
[**] See footnote *, ante.